**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

KNIGHTS ARMAMENT COMPANY,
a Florida sole proprietorship,

        Plaintiff,

v.

OPTICAL SYSTEMS TECHNOLOGY, INC.
a Pennsylvania corporation,
OMNITECH PARTNERS, INC.
a Pennsylvania corporation,
KEYSTONE APPLIED TECHNOLOGIES, INC.,
a Pennsylvania corporation,
PAUL F. MAXIN,
& JOHN DOES 1-50,

        Defendants.
_____/

CASE NO:

6:07-CU-1323-ORL-22KRS

## PLAINTIFF'S COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF

COMES NOW Plaintiff, KNIGHTS ARMAMENT COMPANY ("Plaintiff"), by and through its undersigned counsel, and for its Complaint against Defendants OPTICAL SYSTEMS TECHNOLOGY INC., OMNITECH PARTNERS INC, KEYSTONE APPLIED TECHNOLOGIES, INC., PAUL MAXIN, and JOHN DOES 1-50 ("Defendants") hereby respectfully alleges as follows:

## PARTIES

1.    Plaintiff KNIGHTS ARMAMENT COMPANY is a sole proprietorship organized and existing under the laws of the state of Florida and maintains its principal place of business at 701 Columbia Boulevard, Titusvillle, Florida 32780 and does business within this jurisdictional district and elsewhere throughout the United States.

2.     Upon information and belief, Defendant OPTICAL SYSTEMS TECHNOLOGY INC. ("OSTI") is a corporation organized under the laws of the state of Pennsylvania with its principal place of business located at 110 Kountz Lane, Freeport, Pennsylvania 16229; Defendant OMNITECH PARTNERS INC. ("OMNI") is a Pennsylvania corporation organized under the laws of the state of Pennsylvania with its principal place of business at 108 Kountz Lane, Freeport, Pennsylvania 16229; Defendant KEYSTONE APPLIED TECHNOLOGIES, INC. ("KEYSTONE") is a Pennsylvania corporation organized under the laws of the state of Pennsylvania with its principal place of business at 106 Kountz Lane, Freeport, Pennsylvania 16229; and Defendant PAUL F. MAXIN ("Maxin") is a natural person and Pennsylvania resident, with a business address located at 108 Kountz Lane, Freeport, Pennsylvania 16229.

3.     Plaintiff is currently unaware of the true name(s) and capacity(ies) of the Defendants sued as John Does 1-50 inclusive, and therefore sues said Defendants by said fictitious names.  Plaintiff may seek leave to amend the complaint to show the true names and capacities of all Defendants when same have been ascertained.

## JURISDICTION AND VENUE

4.     This action seeks preliminary and permanent injunctive relief, declaratory relief under 28 U.S.C. §§2201 and 2202, and damages for trademark infringement under the laws of the United States; namely, Title 15 of the United States Code and more particularly 15 U.S.C. §1051, *et seq.*, 15 U.S.C. §1114, and 15 U.S.C. 1116-1118, inclusive; common law trademark infringement, false designation of origin, passing off, false advertising and unfair competition pursuant to Section 43(a) of The Lanham Act, 15 U.S.C. §1391 and 15 U.S.C. 1125(a); dilution of mark and injury to business reputation,

Fla. Stat., §495.151, misleading advertising Fla. Stat. §817.41, Deceptive and Unfair Trade Practices – Fla. Stat. 501.201, *et seq.*, and the Florida common law claim of unfair competition.

5.      Defendants do business in Florida and particularly in this District by (1) selling and shipping products to and within this State, District, and Division; (2) advertising products within this State, District, and Division; (3) soliciting business and orders within this State, District, and Division; and (4) by deriving revenue from the sale of its products within this State, District, and Division without consent or license from Plaintiff.

6.      Defendants have performed acts within this State, District, and Division which have resulted in damage to Plaintiff.

7.      Defendants have committed acts in this District in violation of Plaintiff's exclusive rights under 15 U.S.C. §1115 thereby giving this Court personal jurisdiction over Defendants.  Further, this court has jurisdiction pursuant to 15 U.S.C. §1121 and 28 U.S.C. §1332.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391 and 1400(b).  Further, pursuant to Middle District Local Rule 1.02(c), venue is proper in the Orlando Division of the Middle District of Florida because the alleged acts giving rise to this claim have occurred in counties of which the Orlando Division is comprised as set forth in Local Rule 1.02(b)(3).

9.      Subject matter jurisdiction of this Court is proper pursuant to 28 U.S.C. §1338.

10.     This Court further has jurisdiction for this declaratory relief action under 28 U.S.C. 1331, 1338, 2201, and 2202.

## GENERAL ALLEGATIONS

11.     Plaintiff is a Florida company operating a manufacturing business.

12.     Defendants OSTI, OMNI, and KEYSTONE are Pennsylvania corporations operating manufacturing businesses, and Defendant Paul F. Maxin is a natural person who directed, controlled, ratified, participated in, caused, or is the moving forced behind all actionable conduct alleged herein.

13.     Plaintiff is the owner of United States Federal Trademark Registration Registration Number 2,949,159 for the mark *UNS*, registered May 10, 2005 in International class 9 and assigned to Plaintiff. *See* Exhibit 1 attached.

14.     Plaintiff is the owner of United States Federal Trademark Registration Number 2,949,160 for the mark *KNIGHTSCOPE*, registered May 10, 2005 in International class 9 and assigned to Plaintiff. *See* Exhibit 2 attached.

15.     Plaintiff is the owner of United States Federal Trademark Registration Number 3,171,096 for the mark *UNIVERSAL KNIGHTSCOPE*, registered November 14, 2006 in International class 9 and assigned to Plaintiff. *See* Exhibit 3 attached.

16.     Plaintiff is the owner of United States Federal Trademark Registration Number 2,949,158 for the mark *UKS*, registered May 10, 2005 in International class 9 and assigned to Plaintiff. *See* Exhibit 4 attached.

17.     Plaintiff is the owner of State of Florida Trademark Registration Number T06000000032 for the mark *UNS*, registered on January 10, 2006 in class 0009 and assigned to Plaintiff. *See* Exhibit 5 attached.

18.     Plaintiff is owner of State of Florida Trademark Registration Number T06000000031 for the mark *Universal Night Sight*, registered on January 10, 2006 in class 0009 and assigned to Plaintiff. *See* Exhibit 6 attached.

19.     Since at least the date of issuance, the trademark registrations referred to in 13 through 18 above and attached as Exhibits 1 through 6 have been continuously used by Plaintiff in interstate commerce.

20.     Since the date of issuance, the trademark registrations referred to in 13 through 18 above and attached as Exhibits 1 through 6, notice has been provided to the public that these marks are registered trademarks by affixing notice as provided for in 15 U.S.C. §1111.

21.     Defendant OSTI has applied for federal trademarks on the marks: *UNS, Universal Night Sight, Universal Night Scope, MUNS, Magnum Universal Night Sight, DUNS*, and *Dualband Universal Night Sight*.   OSTI has no federal trademark registrations and no state trademarks on any of these marks.

22.     Defendant OSTI filed a petition to cancel Plaintiff's federal registered trademark for UNS only with the Trademark Trial and Appeal Board (TTAB) at the United States Patent & Trademark Office but the petition is pending and no final decision has been rendered.   Plaintiff's application for the federal trademark UNIVERSAL NIGHT SIGHT has been suspended by the TTAB.

23.     Plaintiff has filed oppositions to cancel Defendant OSTI's trademark applications for the marks *Universal Night Scope, MUNS, Magnum Universal Night Sight, DUNS*, and *Dualband Universal Night Sight* with the Trademark Trial and Appeal Board (TTAB) at the United States Patent & Trademark Office ("USPTO") and no final

decision has been rendered. Defendant OSTI's applications for the marks *UNS* and *Universal Night Sight* have been suspended by the TTAB.

24.    The TTAB at the USPTO has consolidated the cancellation, opposition, and suspension proceedings of the trademarks referenced in paragraphs 22- 23 above.

25.    Plaintiff previously engaged in business with Defendant OSTI where Plaintiff was the prime contractor on a U.S. Government contract and Defendant was a subcontractor to Plaintiff, and both parties worked together on design and engineering work on optical scopes. Plaintiff and all Defendants are now competitors who compete for a common pool of customers. Defendants have been and continue to be on notice of Plaintiff's products and intellectual property rights.

26.    On information and belief, the Defendants have been distributing optical scopes since and have been advertising and selling such instruments and devices within this District and throughout the United States using Plaintiff's trademarks or derivations thereof without consent or license of Plaintiff.

27.    Upon information and belief, one or more of the Defendants was awarded a multi-million dollar contract by the United States Marines Corps for an optical scope for rifles identified by the mark *MUNS* which is also referred to as *MAGNUM UNIVERSAL NIGHT SIGHT*.

28.    One or more of the Defendants have publicly stated in regard to the *MAGNUM UNIVERSAL NIGHT SIGHT* (*MUNS*) that: "The bottom line is this is the best sight."

29.    The *MAGNUM UNIVERSAL NIGHT SIGHT* and *MUNS* optical scopes manufactured and sold by Defendants incorporates the Plaintiff's marks *UNS* and

*UNIVERSAL NIGHT SIGHT* and incorporates variations of Plaintiff's other marks *UNIVERSAL KNIGHTSCOPE, UKS* and *KNIGHTSCOPE.*

30.     Upon information and belief, Plaintiff alleges that at all relevant times the Defendants, alone or in concert through corporate, affiliate, and/or other business relationships, have distributed and sold optical scopes which incorporated the Plaintiff's marks *UNS* and *UNIVERSAL NIGHT SIGHT* and variations of Plaintiff's other marks *UNIVERSAL KNIGHTSCOPE, UKS* and *KNIGHTSCOPE*, without consent or license from Plaintiff.

31.     Defendant OSTI previously filed a protest B-296516.2, B-296516.3 with the United States Government Accountability Office ("GAO") challenging a governmental contract award to Plaintiff alleging that Defendant's optical rifle scopes named *MUNS* and *MAGNUM UNIVERSAL NIGHT SIGHT* were superior to Plaintiff's scopes that were named *UNS* and *UNIVERSAL NIGHT SIGHT*, that Plaintiff made "material misrepresentations" in their contract proposal, and that Plaintiff "will be unable to perform the contract without infringing on OSTI's intellectual property rights." *See* Exhibit 7.

32.     The protest B-296516.2, B-296516.3 was denied by the United States Government in 2006 which further held that Defendant OSTI's optical rifle scopes named *MUNS* and *MAGNUM UNIVERSAL NIGHT SIGHT* were "technically unacceptable" with a "susceptibility....to significant damage and degraded performance." *See* Exhibit 7.

33.     Defendant OSTI has communicated threats to business associates of the Plaintiff alleging that "utilizing OSTI proprietary information would be illegal and cause for the commencement of legal action to protect OSTI's proprietary interests."

34.     Defendants OSTI and Paul Maxin have stated in correspondence to Plaintiff that "'Knightscope' was the name which was used by KAC(Plaintiff) to identify the UNS units….and OSTI(Defendant) claims no right, title, or interest in that name."

35.     Defendants OSTI and OMNI have and continue to publicly display and advertise the trademark registration symbol ® with several versions of unregistered federal trademarks entitled: *STAR TRON,* and have falsely claimed that *UNS, Universal Night Sight, MUNS, Magnum Universal Night Sight, DUNS, Dualband Universal Night Sight, are* "TM" trademarks owned by the Defendants, and have falsely claimed that the Defendants are entitled to own the mark: *Universal Night Scope.*

36.     Defendants OSTI and Maxin applied for three federal trademark registrations on the mark *STAR TRON* and variations thereof in June 2007 by submitting specimens showing a federal registration symbol ® to refer to active trademark registrations that do not exist.

37.     Plaintiff has complied with all conditions precedent to the bringing of this cause of action or such conditions have been waived or excused.

## SPECIFIC ALLEGATIONS

### COUNT I

### Trademark Infringement
### Violation of 15 U.S.C. §1051, et seq., 1114, and 1116-1118 inclusive

38.     Plaintiff repeats and realleges each and all of the allegations contained in paragraphs 1-37 of this pleading as though set forth fully at length herein.

39.     This is an action for trademark infringement and arises under the trademark laws of the United States, namely Title 15 of the United States Code and more particularly, 15 U.S.C. §1051, *et seq.,* 15 U.S.C. 1114 and 15 U.S.C. 1116-1118 inclusive.

40.     The Plaintiff uses and has used the names *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,*   in commerce,

advertising, and marketing efforts in order to identify its optical scope business and products and to distinguish such business and products from businesses and products of others.

41.    The names *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,* constitute protectable registered trademarks under federal and/or state law.

42.    The trademarks *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,* are inherently distinctive or have achieved secondary meaning and said trademarks are primarily nonfunctional thereby rendering it worthy of the protection of the Lanham Act.

43.    Defendants have used and continue to use in interstate commerce the names *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,*  or confusingly similar names or derivations thereof in commercial advertising, promotion, and identification of their businesses and products thereby misrepresenting the nature, characteristics, and qualities of their business and products.

44.    Defendants' actions in adopting and using the names *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,* or confusingly similar names or derivations thereof were willful and wanton or with reckless disregard for the rights of Plaintiff.

45.    Said use has given rise to a likelihood of confusion within relevant channels of commerce of the respective parties since said use is confusing similar to Plaintiff's use of its trademarks.

46.    Plaintiff has thus been damaged including but not limited to loss or impairment of business good will; as a result of Defendants' use of the names *UNS,*

*Universal Night Sight*, *MUNS*, *Magnum Universal Night Sight*, *DUNS*, *Dualband Universal Night Sight*, and *Universal Night Scope*.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Enjoin by injunction all Defendants who have infringed, are infringing, or are otherwise likely to infringe upon Plaintiff's trademarks, service marks, and trade names similar to *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,* by restraining their use of the same or any marks or trade names similar thereto;

b. Enjoin by injunction all Defendants who have utilized, are currently utilizing, or are otherwise likely to utilize any false designation of origin, false or misleading description of fact, or false or misleading representation of fact with respect to any aspect of the products or services at issue herein by restraining their use of the same or any mark or trade name similar to *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,* on businesses, products, or services in the stream of interstate commerce, in any commercial advertising, or in any other manner;

c. Award Plaintiff all actual damages suffered by reason of Defendants' wrongful manufacture, use, display, sale, false designation of origin, reverse passing or palming off, and/or false advertising of Plaintiff's trademarks, service marks, and trade names similar *UNS, UNIVERSAL*

*NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and

*UKS,* and all businesses, products, and services associated therewith;

d. Award Plaintiff three times the amount found as actual damages pursuant to 15 U.S.C. § 1117(a);

e. Award Plaintiff all profits of the Defendants derived from the wrongful manufacture, use, display, sale, false designation of origin, and/or false advertising of Plaintiff's trademarks, service marks, and trade names;

f. Award Plaintiff the costs of this action;

g. Award Plaintiff reasonable attorney's fees pursuant to 15 U.S.C. § 1117(a);

h. Order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of Defendants bearing the word, term, name, symbol, device, combination thereof, designation, description, or representation that is the subject of this count, or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and all other means of making same be delivered up and destroyed pursuant to 15 U.S.C. § 1118;

i. Award Plaintiff all other relief that this Court may deem just and proper including pre- and post-judgment interest.

## COUNT II

### Unfair Competition and False Designation of Origin
### Violation of Lanham Act, § 1125(a) a/k/a Section 43(a)

47.    Plaintiff repeats and realleges each and all of the allegations contained in paragraphs 1-37 of this pleading as though set forth fully at length herein.

48.    The names *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,* constitute distinctive and famous trademarks pursuant to 15 U.S.C. § 1125(a).

49.    Defendants have used and continue to use the names and words *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE, and UKS,* or confusingly similar names or derivations thereof to advertise and sell goods and services in interstate commerce and in a manner likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Defendants to Plaintiff, or as to the origin, sponsorship, or approval of Defendants' business by Plaintiff.

50.    All actions by Defendants described in the paragraph hereinabove above were and are willful and wanton or with reckless disregard for the rights of Plaintiff.

51.    Consumers of the goods and services at issue herein reasonably associate the names or words *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE, and UKS,* and are or likely would be confused as to the source of the goods and services advertised and sold by Defendants that contain said marks and names or similar versions thereof.

52.    Plaintiff has been damaged as a result of Defendants' use of the names or words *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,* or confusingly similar names or derivations thereof including

UNS, *Universal Night Sight*, MUNS, *Magnum Universal Night Sight*, DUNS, *Dualband Universal Night Sight,* and *Universal Night Scope.*

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Enjoin by injunction all Defendants who have diluted, are diluting, or are otherwise likely to dilute Plaintiff's trademarks, service marks, and trade names *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,* by restraining their use of the same or any mark or trade name similar thereto;

b. Award Plaintiff all actual damages suffered by reason of Defendants' wrongful dilution of Plaintiff's trademarks, service marks, and trade names *UNS, UNIVERSAL NIGHT SIGHT, KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE,* and *UKS,*;

c. Award Plaintiff three times the amount found as actual damages pursuant to 15 U.S.C. § 1117(a);

d. Award Plaintiff all profits of the Defendants derived from the use and dilution of Plaintiff's trademarks, service marks, and trade names and all goods and services associated therewith;

e. Award Plaintiff the costs of this action;

f. Award Plaintiff a reasonable attorney's fee pursuant to 15 U.S.C. § 1117(a);

g. Order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of Defendants bearing the word, term, name, symbol, device, combination thereof, designation, description, or

representation that is the subject of this count, or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and all other means of making same be delivered up and destroyed pursuant to 15 U.S.C. § 1118;

h.  Award Plaintiff all other relief that this Court may deem just and proper including pre- and post-judgment interest.

## COUNT III

### False Advertising - Section 43(a)(1)(B) of the Lanham Act; 15 U.S.C. 1125(a)

53.  Plaintiff repeats and realleges each and all of the allegations contained in paragraphs 1-37 of this pleading as though set forth fully at length herein.

54.  Plaintiff is a competitor of Defendants because the parties advertise and sell goods generally described as optical scopes in interstate commerce.

55.  Defendants have advertised that their optical scopes and, specifically, the scopes named *UNS, Universal Night Sight, MUNS, Magnum Universal Night Sight, DUNS*, and *Dualband Universal Night Sight,* are "TM" trademarks and advertised the trademark registration symbol ® for three different unregistered federal trademarks that use the terms *STAR TRON.*

56.  Defendants' advertisements are false or misleading.

57.  Defendants' advertisements deceived, or had the capacity to deceive, a substantial portion of the targeted audience.

58.  Defendants' advertisements are material deceptions meaning that they are likely to influence purchasing decisions.

59.  Defendants' deceptive advertisements affected interstate commerce.

60.   Plaintiff has been injured as a result of Defendants' deceptive advertisements thereby resulting in damages to Plaintiff.

61.   Defendants' deceptive advertisements were made in bad faith.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants for violation of Section 43(a)(1)(B) of the Lanham Act; 15 U.S.C. 1125(a) and:

a.   Enjoin by injunction Defendants who have or are otherwise likely to circulate any false or misleading description of fact, or false or misleading representation of fact with respect to any aspect of the optical scope products or businesses at issue herein by restraining their use of the symbols "TM" and "®" or other words or symbols suggesting that their product names constitute trademarks in the stream of interstate commerce in any advertising or in any other manner;

b.   Award Plaintiff all actual damages suffered by reason of Defendants' false advertising;

c.   Award Plaintiff three times the amount found as actual damages pursuant to 15 U.S.C. § 1117(a);

d.   Award Plaintiff all profits of the Defendants derived from the false advertising of their optical scope products or businesses;

e.   Award Plaintiff the costs of this action;

f.   Award Plaintiff reasonable attorney's fees pursuant to 15 U.S.C. § 1117(a);

g.  Order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of Defendants bearing the words, terms, designations, descriptions, or representations that are the subject of this count, or any reproduction, copy, or colorable imitation thereof, and all plates, molds, matrices, and all other means of making same be delivered up and destroyed pursuant to 15 U.S.C. § 1118;

h.  Award Plaintiff all other relief that this Court may deem just and proper including pre- and post-judgment interest.

## COUNT IV

### Florida Trademark Infringement
### Florida's Trademark Act at Section 495.151, Florida Statutes, *et. seq.*

62.    Plaintiff repeats and realleges each and all of the allegations contained in paragraphs 1-37 of this pleading as though set forth fully at length herein.

63.    The trademarks and trade names *UNS* and *Universal Night Sight* are registered trademarks under Florida law which marks are identified respectively as Florida Trademark Registration Nos. T06000000032 and T06000000031 and are registered to Plaintiff.

64.    Plaintiff has used the trademarks and trade names *UNS* and *Universal Night Sight* in the ordinary course of their business in Florida prior to the alleged infringing use thereof by the Defendants.

65.    Defendants have used and continue to use the names and words *UNS* and *Universal Night Sight* or confusingly similar names and words to advertise and identify themselves as the source of optical scope products in Florida.

66.     There has been and continues to be competition between Plaintiff and Defendant with respect to the sale and advertisement of optical scope products and businesses in Florida and Defendants' use of the names and words *UNS, Universal Night Sight*, *MUNS, Magnum Universal Night Sight*, *DUNS*, and *Dualband Universal Night Sight,* or similar names and words creates confusion as to the source of the goods and services.

67.     Plaintiff has been damaged as a result of Defendants' use of the names and words *UNS, Universal Night Sight*, *MUNS, Magnum Universal Night Sight*, *DUNS, Dualband Universal Night Sight,* and *Universal Night Scope* or similar names and words which infringe Plaintiff's Florida state trademarks *UNS* and *Universal Night Sight*.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a.  Enjoin by injunction all Defendants who have infringed, are infringing, or are otherwise likely to infringe upon Plaintiff's trademarks and trade names *UNS* and *Universal Night Sight*, by restraining their use of the same or any mark, trade name, or form of advertisement similar thereto including but not limited to *UNS, Universal Night Sight*, *MUNS, Magnum Universal Night Sight*, *DUNS, Dualband Universal Night Sight,* and *Universal Night Scope*;

b.  Award Plaintiff all damages suffered by reason of Defendants' wrongful manufacture, use, display, or sale of goods and services bearing Plaintiff's trademarks and trade names or similar versions thereof;

c. Award Plaintiff all profits of the Defendants derived from the wrongful manufacture, use, display, or sale of goods and services bearing Plaintiff's trademarks and trade names or similar versions thereof;

d. Award Plaintiff reasonable attorney's fees and the costs of this action;

e. Award Plaintiff all other relief that this Court may deem just and proper including pre- and post-judgment interest and any enhanced, liquidated, exemplary, consequential, and compensatory damages available under Florida law for violation of Florida's trademark statute.

## COUNT V

## Misleading Advertising - Fla. Stat. 817.41

68.     Plaintiff repeats and realleges each and all of the allegations contained in paragraphs 1-37 of this pleading as though set forth fully at length herein.

69.     Defendants have misleadingly advertised that their *UNS, Universal Night Sight*, *MUNS, Magnum Universal Night Sight*, *DUNS*, and *Dualband Universal Night Sight,* optical scope products and businesses are "TM" trademarks and advertised the trademark registration symbol ® for three different unregistered federal trademarks that use the terms *STAR TRON.*

70.     Defendants made a misrepresentation of material fact; namely that their *UNS, Universal Night Sight*, *MUNS, Magnum Universal Night Sight*, *DUNS*, and *Dualband Universal Night Sight,* optical scope products and businesses are "TM" trademarks and that they own trademark registration symbols ® for three unregistered

federal trademarks that use the terms *STAR TRON*, and that they are entitled to own a trademark on the mark *Universal Night Scope.*

71.     Defendants knew or should have known of the falsity of the aforementioned misrepresentations.

72.     Defendants intended that the misrepresentations would induce another to rely and act on them.

73.     Defendants' misrepresentations were made with the intent or purpose, either directly or indirectly, of selling or disposing of property or services or to induce the public to enter into any obligation relating to such property or services.

74.     Defendants' misrepresentations were made in bad faith and with malice or reckless indifference to the Plaintiff's and consumer's interests.

75.     Plaintiff has suffered injury as a result of the misrepresentations.

**WHEREFORE,** Plaintiff respectfully requests that judgment be entered in favor of Plaintiff and against Defendants for misleading advertising in violation of Fla. Stat. 817.41 and that Plaintiff be awarded actual damages, costs, attorney's fees, and punitive damages pursuant to Fla. Stat. 817.41(6) and that an injunction be issued enjoining Defendants from disseminating the misleading advertising described hereinabove, plus such other and further relief the Court deems necessary and just.

## COUNT VI

### Unfair Competition – Florida Common Law

76.     Plaintiff repeats and realleges each and all of the allegations contained in paragraphs 1-37 of this pleading as though set forth fully at length herein.

77.     Defendants have engaged in deceptive and fraudulent conduct by advertising that their *UNS, Universal Night Sight, MUNS, Magnum Universal Night Sight, DUNS,* and *Dualband Universal Night Sight,* optical scope products and businesses are "TM" trademarks and that they own trademark registration symbols ® for three unregistered federal trademarks that use the terms *STAR TRON.*

78.     Defendants knew or should have known of the falsity of the aforementioned misrepresentations.

79.     Defendants intended that the misrepresentations would induce others to rely and act on them.

80.     Defendants' misrepresentations have caused or are likely to cause consumer confusion.

81.     Defendants' misrepresentations were made in bad faith and with malice or reckless indifference to the Plaintiff's and consumer's interests.

82.     Plaintiff has suffered injury as a result of the misrepresentations.

**WHEREFORE,** Plaintiff respectfully requests that judgment be entered in favor of Plaintiff and against Defendants for unfair competition in violation of Florida common law and that Plaintiff be awarded actual damages, costs, and punitive damages and that an injunction be issued enjoining Defendants from disseminating the misrepresentations described hereinabove, plus such other and further relief the Court deems necessary and just.

## COUNT VII

### Deceptive and Unfair Trade Practices – Fla. Stat. 501.201, *et seq.*

83.     Plaintiff repeats and realleges each and all of the allegations contained in paragraphs 1-37 of this pleading as though set forth fully at length herein.

84.     Defendants have engaged in deceptive and unfair trade practices in a trade or commerce by advertising that their *UNS, Universal Night Sight*, *MUNS, Magnum Universal Night Sight*, *DUNS*, and *Dualband Universal Night Sight,* optical scope products and businesses are "TM" trademarks and that they own trademark registration symbols ® for three unregistered federal trademarks that use the term *STAR TRON*, and that they are entitled to own a trademark named *Universal Night Scope.*

85.     Defendants knew or should have known of the falsity of the aforementioned misrepresentations.

86.     Defendants intended that the misrepresentations would induce others to rely and act on them.

87.     Defendants' misrepresentations violate standards of unfairness and deception as set forth and interpreted by federal courts and/or violate 15 U.S.C. 1125(a) and Fla. Stat. 817.41, all of which proscribe unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

88.     Defendants' conduct has misled the consuming public concerning the nature and legal status of their optical scope products and businesses to the consuming public's detriment and the detriment of Plaintiff's legitimate business enterprise.

**WHEREFORE**, Plaintiff respectfully requests that the Court (1) enter a declaratory judgment that Defendants acts of misrepresentation in advertising constitute unfair and

deceptive trade practices in violation of Fla. Stat. 501.201, *et seq.*, (2) award Plaintiff its attorney's fees and costs as provided under Fla. Stat. 501.2105 and make such award part of a judgment in favor of Plaintiff and against Defendants, (3) enter an injunction enjoining Defendants from disseminating the unfair and deceptive statements described hereinabove, and (4) grant such other and further relief the Court deems necessary and just.

DATED this 23 day of August 2007.

HOLLIFIELD LEGAL CENTRE
By:

Travis R. Hollifield – Trial Counsel
Florida Bar No.: 0094420
147 E. Lyman Avenue – Suite C
Winter Park, Florida 32789
Telephone: (407) 599-9590
Facsimile: (407) 599-9591
Email: trh@trhlaw.com

LAW OFFICES OF BRIAN S. STEINBERGER, P.A.
Brian S. Steinberger, Esq.
Florida Bar No: 43206
101 Brevard Avenue
Cocoa, Florida 33922
Telephone: (321) 633-5080
Facsimile: (321) 633-9322
Email: brianss@vol.com
AS ATTORNEYS FOR PLAINTIFF



## United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Sat Aug 18 04:06:53 EDT 2007

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC |
| LAST DOC |

Logout    Please logout when you are done to release system resources allocated for you.

Start    List At:          OR    Jump    to record:    **Record 17 out of 23**

**( Use the "Back" button of the Internet Browser to return to TESS)**

| TARR Status | ASSIGN Status | TDR | TTAB Status |

### Typed Drawing

| | |
|---|---|
| **Word Mark** | UNS |
| **Goods and Services** | IC 009, US 021 023 026 036 038. G & S: optical scope which provides vision capability in low light situations, with or without additional magnification devices. FIRST USE: 20030801. FIRST USE IN COMMERCE: 20030801 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 76516796 |
| **Filing Date** | May 9, 2003 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | December 2, 2003 |
| **Registration Number** | 2949159 |



EXHIBIT _____ /

Trademark Electronic Search System (TESS)

| | |
|---|---|
| Current Filing Basis | 1A |
| Original Filing Basis | 1A |
| Published for Opposition | August 29, 2006 |
| Registration Number | 3171096 |
| Registration Date | November 14, 2006 |
| Owner | (REGISTRANT) **Knight's Armament** Company C. Reed **Knight**, Jr., US citizen SOLE PROPRIETORSHIP FLORIDA 701 Columbia Blvd. Titusville FLORIDA 32780 |
| Attorney of Record | Brian S. Steinberger |
| Prior Registrations | 2949158;2949159;2949160 |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL-2(F)-IN PART |
| Live/Dead Indicator | LIVE |
| Distinctiveness Limitation Statement | as to "UNIVERSAL" |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC |

| LAST DOC |

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Trademark Electronic Search System (TESS)



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Aug 18 04:06:53 EDT 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC |

| LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At:            OR   Jump   to record:   **Record 18 out of 23**

| TARR Status | ASSIGN Status | TDR | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | KNIGHTSCOPE |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: optical scope which provides vision capability in low light situations, with or without additional magnification devices. FIRST USE: 20030801. FIRST USE IN COMMERCE: 20030801 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 76516799 |
| **Filing Date** | May 9, 2003 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | December 2, 2003 |
| **Registration Number** | 2949160 |

EXHIBIT ___2___

Trademark Electronic Search System (TESS)

**Registration Date**     May 10, 2005
**Owner**     (REGISTRANT) **Knight's Armament** Company SOLE PROPRIETORSHIP FLORIDA 701 Columbia Blvd. Titusville FLORIDA 32780
**Attorney of Record**     Brian S. Steinberger
**Type of Mark**     TRADEMARK
**Register**     PRINCIPAL
**Live/Dead Indicator**  LIVE

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC |

| LAST DOC |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Trademark Electronic Search System (TESS)



**United States Patent and Trademark Office**

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

**Trademarks > Trademark Electronic Search System (TESS)**

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC
LAST DOC

TESS was last updated on Sat Aug 18 04:06:53 EDT 2007

Logout Please logout when you are done to release system resources allocated for you.

Start List At: OR Jump to record: **Record 11 out of 23**

TARR Status | ASSIGN Status | TDR | TTAB Status   ( *Use the "Back" button of the Internet Browser to return to TESS)*

## UNIVERSAL KNIGHTSCOPE

**Word Mark**    UNIVERSAL KNIGHTSCOPE

**Goods and Services**    IC 009. US 021 023 026 036 038. G & S: Optical rifle scopes for providing vision capability in low light situations, with or without additional magnification devices; optical rifle sites; infra-red night vision weapon sights, electronic controllers for optical scopes and sites, namely controllers and mounting assemblies. FIRST USE: 20000920. FIRST USE IN COMMERCE: 20000920

**Standard Characters Claimed**

**Mark Drawing Code**    (4) STANDARD CHARACTER MARK

**Serial Number**    78747500

**Filing Date**    November 4, 2005

EXHIBIT 3

Trademark Electronic Search System (TESS)

| | |
|---|---|
| Registration Date | May 10, 2005 |
| Owner | (REGISTRANT) Knight's Armament Company SOLE PROPRIETORSHIP FLORIDA 701 Columbia Blvd. Titusville FLORIDA 32780 |
| Attorney of Record | Brian S. Steinberger |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC

LAST DOC

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY



## United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Sat Aug 18 04:06:53 EDT 2007

**TESS HOME**  **NEW USER**  **STRUCTURED**  **FREE FORM**  **BROWSE DICT**  **SEARCH OG**  **BOTTOM**  **HELP**  **PREV LIST**  **CURR LIST**  **NEXT LIST**  **FIRST DOC**  **PREV DOC**  **NEXT DOC**

**LAST DOC**

**Logout**  Please logout when you are done to release system resources allocated for you.

**Start** List At: _____ OR **Jump** to record: _____

**Record 21 out of 23**

**TARR Status**  **ASSIGN Status**  **TDR**  **TTAB Status**  ( Use the "Back" button of the Internet Browser to return to TESS)

## Typed Drawing

| | |
|---|---|
| **Word Mark** | UKS |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: optical scope which provides vison capability in low light situations, with or without additional magnification devices. FIRST USE: 20030801. FIRST USE IN COMMERCE: 20030801 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 76516795 |
| **Filing Date** | May 9, 2003 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | December 9, 2003 |
| **Registration Number** | 2949158 |

EXHIBIT ___4___

Trademark Electronic Search System (TESS)

**Registration Date**   May 10, 2005
**Owner**   (REGISTRANT) **Knight's Armament** Company SOLE PROPRIETORSHIP FLORIDA 701 Columbia Blvd. Titusville FLORIDA 32780
**Attorney of Record**   Brian S. Steinberger
**Type of Mark**   TRADEMARK
**Register**   PRINCIPAL
**Live/Dead Indicator**   LIVE

| TESS Home | New User | Structured | Free Form | Browse Dict | Search OG | Top | Help | Prev List | Curr List | Next List | First Doc | Prev Doc | Next Doc |
| Last Doc |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

www.sunbiz.org - Department of State
Case 6:07-cv-01323-ACC-DAB Document 1 Filed 08/23/07 Page 31 of 43 PageID 31
Page 1 of 1

## FLORIDA DEPARTMENT OF STATE
## DIVISION OF CORPORATIONS

Home      Contact Us      E-Filing Services      Document Searches      Forms      Help

**Previous on List**      **Next on List**      **Return To List**

No Events      No Name History

# Detail by Trademark Name

## TRADEMARK

UNS

## Filing Information

**Document Number**    T06000000032
**Date Filed**    01/10/2006
**Expiration Date**    01/10/2016
**First Used in Florida**    10/05/2001
**First Used Anywhere**    10/05/2001
**Status**    ACTIVE

EXHIBIT 5

**Mark Used In Connection With**
OPTICAL SCOPES, OPTICAL SITES, REFLEX SIGHTS,LASER POINTS, AIMING LIGHTS, TACTICAL
LIGHTS*******SEE IMAGE FOR ENTIRETY OF GOODS*******

## Owners

**Name & Address**

KNIGHT'S ARMAMENT COMPANY
701 COLUMBIA BLVD.
TITUSVILLE FL 32780

## Type/Class

TM-0009    0000000000 0000000000 0000000000 0000000000
0000000000 0000000000 0000000000 0000000000 0000000000
0000000000 0000000000 0000000000 0000000000 0000000000
0000000000 0000000000 0000000000 0000000000 0000000000

## Cross Reference

**No Cross Reference**

## Document Images

01/10/2006 -- Trademark

Note: This is not official record. See documents if question or conflict.

Home  Contact us  Document Searches  E-Filing Services  Forms  Help
Copyright and Privacy Policies
Copyright © 2007 State of Florida, Department of State.

Case 6:07-cv-01323-ACC-DAB   Document 1   Filed 08/23/07   Page 32 of 43 PageID 32
www.sunbiz.org - Department of State
Page 1 of 2



**FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS**

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

**Previous on List**   **Next on List**   **Return To List**

No Events   No Name History

# Detail by Trademark Name

## Trademark

UNIVERSAL NIGHT SIGHT

## Filing Information

**EXHIBIT____6____**

| | |
|---|---|
| **Document Number** | T06000000031 |
| **Date Filed** | 01/10/2006 |
| **Expiration Date** | 01/10/2016 |
| **First Used in Florida** | 12/07/2000 |
| **First Used Anywhere** | 12/07/2000 |
| **Status** | ACTIVE |

**Mark Used In Connection With**
OPTICAL SCOPES, OPTICAL SITES, REFLEX SIGHTS,LASER POINTS, AIMING LIGHTS, TACTICAL
LIGHTS*****SEE IMAGE FOR ENTIRETY OF GOODS*********

**Disclaimer For**
"SIGHT"

## Owners

**Name & Address**

KNIGHT'S ARMAMENT COMPANY
701 COLUMBIA BLVD.
TITUSVILLE FL 32780

## Type/Class

TM-0009   00000000000 00000000000 00000000000 00000000000
00000000000 00000000000 00000000000 00000000000 00000000000
00000000000 00000000000 00000000000 00000000000 00000000000
00000000000 00000000000 00000000000 00000000000 00000000000

## Cross Reference

**No Cross Reference**

## Document Images

01/10/2006 -- Trademark

**Note:** This is not official record. See documents if question or conflict.

www.sunbiz.org - Department of State

Home  Contact us  Document Searches  E-Filing Services  Forms  Help
Copyright and Privacy Policies
Copyright © 2007 State of Florida, Department of State.

# B-296516.2; B-296516.3, Optical Systems Technology, Inc., March 17, 2006

**DOCUMENT FOR PUBLIC RELEASE**

The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

Decision

**Matter of:** Optical Systems Technology, Inc.

**File:** B-296516.2; B-296516.3

**Date:** March 17, 2006

Michael R. Charness, Esq., and Amy R. Napier, Esq., Vinson & Elkins, for the protester.

James A. McMillan, Esq., Grayson & Kubli, for Knight's Armament Company, an intervenor.

Maj. Peter H. Tran, and Raymond M. Saunders, Esq., for the agency.

David A. Ashen, Esq., and John M. Melody, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

## DIGEST

Protest that rejection of proposal was based on unreasonable testing of protester's sample night sights for .50 caliber rifles is denied where, contrary to protester's assertion, record indicates that agency undertook reasonable efforts to ensure that sights were securely mounted and properly adjusted during testing; even if these efforts were not entirely successful (and there is no basis in the record for reaching such a conclusion), the agency could reasonably conclude that the susceptibility of protester's sights to significant damage and degraded performance, notwithstanding reasonable efforts to mount the sights correctly,

**EXHIBIT** 7

rendered the sights technically unacceptable.

DECISION

We deny the protest.

Optical Systems Technology, Inc. (OSTI) protests the award of a contract to Knight's Armament Company (KAC) under request for proposals (RFP) No. H92222-05-R-0007, issued by the United States Special Operations Command for non-developmental Visual Augmentation System (VAS) In-Line Clip-on Night Sights. OSTI asserts that the agency's rejection of its proposal was based on unreasonable testing of its sample items. OSTI also challenges the evaluation of KAC's proposal.

The RFP contemplated award of an indefinite-delivery/indefinite-quantity, fixed-unit-price contract for up to 3,000 VAS night sights over a 5-year period. The RFP's performance specification provided that the night sight shall be an in-line, clip-on image intensification sight, utilizing a GEN III/OMNI IV image intensifier tube as a minimum, mainly for use on Army XM107 and Navy M88PIP (Mk15) .50 caliber sniper rifles during nighttime operations. The night sight clips onto a mounting rail along the top of the weapon, directly in front of the existing dayscope, providing a quick attach/detach capability for nighttime operation while maintaining the dayscope boresight. Performance Specification sect. 3.2, VAS Night Vision Devices Sample Test Report sect. 1. The performance specification required use of an adjustable, locking single-throw lever-type mounting system, KAC Knightscope base assembly part No. 22097 or equivalent, allowing for single-hand operation and attachment/mounting on a Military Standard (MIL-STD) 1913 mounting rail. Performance Specification sect. 3.4.3.

Among the several performance requirements set forth in the performance specification were requirements relating to accuracy and resistance to weapons shock. Regarding accuracy, the specification provided that the sight "shall allow a trained sniper to maintain his current level of accuracy as a (threshold), and deliver precise fire within one minute of angle (1 MOA) (objective)." Id. sections 3.5.4, 4.5.4.1.1 However, the specification further stated that "[a]ny sight placed on the weapon shall not degrade the shooters current level of accuracy", according to the specification, "[i]f a weapon is accurate to 1 MOA accuracy, then with all other factors, environment, shooter, ammunition, etc., factored in, the shooter shall be able to maintain that level of accuracy or whatever accuracy he can attain with his current scope." Id. As for weapons shock, the performance specification provided as follows:

The Sight in its operational configuration, shall not be damaged nor exhibit any degradation in performance when subjected to five groups of five rounds each. The Sight in its operational configuration, shall not be damaged nor exhibit any degradation in performance when subjected to a total of 300 rounds of equivalent shock on the .50 caliber sniper rifles. Equivalent shock is equal to [an] average peak acceleration height of 4000gs for a mean duration of 1 millisecond half sine wave.

Id. sections 3.5.15, 4.5.10.

The solicitation required offerors to submit two sample sights "representative of production ready systems," and provided that "[t]he Government will test the samples requested and evaluate them for compliance with the Performance Specifications and Specification Matrix." RFP at 17. Award was to be made to the responsible offeror whose proposal was determined to represent the "best value" to the government based on three evaluation factors: (1) technical, including technical approach and management approach; (2) past performance; and (3) price. The technical approach subfactor included consideration not only of the extent to which the product sample met the performance specifications, but also of the extent to which the overall proposal demonstrated that the proposed night sight enhances the effectiveness of military units under a spectrum of operational conditions. RFP at 22. The technical evaluation factor was significantly more important than past performance, which was significantly more important than price.

KAC and OSTI submitted proposals by the initial closing time. The agency then conducted discussions with the offerors and requested revised proposals. When award subsequently was made to KAC, on May 17, OSTI protested to our Office, alleging (among other things) that the agency had failed to test its sample sights in accordance with the requirements of the solicitation. In response, SOC undertook corrective action, opening discussions with KAC and OSTI, and requesting revised proposals. In its revised proposal, OSTI proposed its MUNS 911M night sight, and also proposed its MUNS 911XR sight; KAC proposed its UNS LR-LP sight. The prior product samples having been returned, the offerors submitted new product samples.

During the Naval Surface Warfare Center (NSWC) Crane's August testing of OSTI's sample MUNS 911M night sights, after the firing of 10 rounds by an XM107 .50 caliber rifle and 10 rounds by an Mk15 .50 caliber rifle, one of OSTI's two sights (serial number (S/N) 0060) sustained damage in the form of a crack at a notch at the bottom of the objective lens at the front of the sight. When the agency then resumed testing with the other OSTI MUNS 911M sample (S/N 0061), that sight sustained damage in the form of a shattered image intensification tube after a total of 89 .50 caliber rounds were fired by the XM107 and Mk15 rifles. Since neither sample sight satisfied the performance specification requirement that the sight not suffer any damage when subjected to the firing of 300 rounds by a .50 caliber rifle, the MUNS 911M was rated unacceptable under the technical factor. Likewise, during testing of one of OSTI's sample MUNS 911XR sights, the sight introduced an approximately 2.7 MOA shift with the Mk15 rifle and up to a 4.1 MOA shift with the XM107 rifle between the groups of rounds fired with the dayscope and the groups fired when the dayscope and night sight were used in combination, thereby failing to meet the performance specification requirement that the current level of accuracy not be degraded by addition of the night scope. As a result, the MUNS 911XR also was determined to be unacceptable under the technical factor. In contrast, KAC's UNS LR-LP sight was determined to be technically acceptable. Inasmuch as KAC's proposal was rated low risk under the past performance factor, and its price was evaluated as fair and reasonable, KAC's proposal, the only acceptable proposal, was determined to offer the best value to the government. Upon learning of the resulting award to KAC, and after being debriefed, OSTI filed this protest with our Office.

## SAMPLE TESTING

OSTI challenges the evaluation of its sample items as unacceptable on the basis that the agency's testing was conducted improperly in that the testers failed to mount the sights properly. In this regard, OSTI furnished its sights to the agency mounted atop a KAC mount that had been modified by OSTI. The KAC mount was to be clipped onto the mounting rail on top of the rifle using a single mounting lever, followed by adjustment using a pair of adjustment screws to ensure a tight (but not too tight) fit,

and tightening of a pair of locking (jam) screws to ensure that the adjustment screws would not come loose or back out under the significant recoil forces experienced during the firing of the .50 caliber rifle. Specifically, according to the laminated directions sheet furnished with the sights, in order "to install and lock" the sights onto the mounting rail atop the rifle, the shooter was to "push lever flat against mount base until it clicks," and then "adjust hex head screws to make sure the base is securely seated and tightened down onto the rail. (See adjustment instructions for base)." The referenced adjustment instructions panel on the laminated sheet read as follows:

> Adjusting Mount Base. (Mount should be adjusted for each weapon it is placed on.) To tighten the mount first loosen the two button head Allen [adjustment] screws. Turn the set [locking] screws on the opposite side of the mount clockwise slightly (making sure to turn in the set screws an equal amount). Retighten the two button head Allen screws. To loosen mount loosen the two button head Allen screws. Turn the set screws on the opposite side of the mount slightly counter-clockwise (making sure to turn out the set screws an equal amount). Retighten the two button head screws. Test mount on the rail to make sure adjustment is correct. MOUNT SHOULD BE VERY TIGHT ON RAIL.

OSTI Laminated Directions Sheet; see Hearing Transcript (Tr.) I-149 to I-154.

According to the testimony of OSTI's vice president for technology (and co-owner) at the hearing conducted by our Office in this matter, and as confirmed by the agency's night vision sight technical expert, in the event the mount was loose on the rail, the mount and sight could undergo a pitching or rocking motion during firing, with the front of the mount and sight rocking forward and down towards the mounting rail and then rocking back and upward. Tr. at I-153, II-307, II-345. The protester's vice president noted in this regard that the sight could appear to be tight on the rail if tested by attempting to move the sight back and forth, but still not be tight enough to be securely mounted. As support for the possibility that the sights were not securely mounted on the rail, the vice president testified that a locking set screw was missing on the tested MUNS 911XR sample sight returned at the conclusion of the procurement and that there did not appear to be the amount of wear on the heads of the mount screws on the returned sights that would be expected had the screws been repeatedly adjusted. The vice president concluded that the most likely cause of the up to 4.1 MOA shift in OSTI's MUNS 911XR sample sight was either the sight striking the mounting rail, or simply severe whiplash from the rocking motion during firing, causing an internal element of the sight to move. Similarly, according to the vice president, the most likely cause of the cracking of the objective lens on one of the sample MUNS 911M night sights and the shattering of the image intensifier tube on the other was either a rail strike or severe whiplash. Tr. at II-307 to II-310, II-321, II-336 to II-359. Since, according to the vice president, the night sight will not come loose during firing if properly mounted, he concluded that the mounting screws were improperly adjusted. Id. Specifically, as OSTI stated in its post-hearing comments,

> [d]espite the instructions provided by OSTI regarding the need for adjustments each time the nightsight is mounted onto a rail for the first time, the record demonstrates that the adjustments were not made as required by OSTI's instructions. As a result, OSTI's nightsights suffered physical damage and a degradation of performance, which caused the Army to exclude OSTI's proposal from final consideration for award.

U.S. GAO - B-296516.2; B-296516.3, Optical Systems Technology, Inc., March 17, 2006

Page 5 of 10

OSTI Comments, Feb. 17, 2006, at 35.

Our Office will review an allegedly improper technical evaluation of product samples to determine whether the evaluation was fair, reasonable, and consistent with the evaluation criteria. We will not make an independent determination of the merits of an offeror's proposal; rather, we will review the evaluation record, including the results of any test demonstration, to ensure that the agency's technical judgment has a rational basis and is consistent with the stated evaluation criteria. USIA Underwater Equip. Sales Corp., B-292827.2, Jan. 30, 2004, 2004 CPD para. 32 at 3; Sun Chem. Corp., B-288466 et al., Oct. 17, 2001, 2001 CPD para. 185 at 7.

We find no basis for concluding that the agency unreasonably failed to ensure that the night sights were securely mounted during testing. The XM107 and Mk15 .50 caliber sniper rifles used for testing were equipped with MIL-STD 1913 mounting rails, as specified in the performance specification, and the tests were conducted by experienced weapons testers and/or snipers, including (1) an engineer who served as the agency's technical expert for night vision weapons sights for special operations forces, (2) an experienced weapons test engineer, and (3) a retired Navy SEAL sniper. The agency's night vision sights expert testified that he initially mounted the sights on the rifles and adjusted them; he followed OSTI's written directions on the laminated sheet when mounting OSTI's sights and instructed the other two testers in how to mount the sights in accordance with OSTI's directions; the testers had OSTI's laminated directions card available next to the rifles and consulted it; he personally observed the other testers most of the time and saw them making adjustments consistent with OSTI's directions during the daytime shooting; and the screws on the mounts were adjusted when switching the sights to a new weapon or when the screws appeared loose. Although this expert stated he was unable to directly observe the adjustments made by the tester during the night accuracy shooting, he testified that this did not occur until the third day of testing, at which point the designated night shooter, the retired Navy SEAL sniper, was comfortable with the process. Tr. at I-156 to I-165, I-185 to I-200, I-248 to I-250. In any case, the record indicates that the damage to OSTI's MUNS 911M sights occurred during the preceding daytime shooting, not during the nighttime shooting on the third day of testing. Declaration of Agency Night Vision Weapons Sights Expert, Mar. 8, 2006, see VAS Night Vision Devices Sample Test Report sect. 3.3.4.2, MUNS Test Data Sheets. Thus, contrary to OSTI's position, eyewitness testimony supports the view that the agency's testers, all of whom were experienced, reasonably attempted to perform the adjustments in accordance with OSTI's written directions.

The agency asserts that the damage to OSTI's sights and degradation in their performance more likely was caused by the unique characteristics and design of the sights, rather than by any testing errors. The record supports this view. In this regard, we note that the contemporaneous records of the testing, as well as the declarations and testimony of the agency's night vision sights expert, indicate that the screws on the mounts of KAC's sights came loose as frequently as the screws on OSTI's mounts. Tr. at I-217. However, damage and degraded performance were experienced by OSTI's sights but not by KAC's sights. This appears especially significant in light of the fact that the mounts on KAC's sights were adjusted less frequently than those on OSTI's sights; KAC's mounts were adjusted only when they appeared loose, not also when the sights were transferred between rifles, as was necessary with OSTI's sights. Tr. at I-218, I-254 to I-257, I-281 to I-282.

Further, by its own statements OSTI has essentially conceded that its design may have been responsible for damage to the MUNS 911M sights. Specifically, the MUNS 911M sight, which has a larger diameter objective lens than either OSTI's MUNS

U.S. GAO - B-296516.2; B-296516.3, Optical Systems Technology, Inc., March 17, 2006

Page 6 of 10

911XR sight or the KAC sight, has a notch cut into the base of the lens that is contoured to allow the sight to fit closely around the MIL-STD 1913 mounting rail. The XM107 rifle, meanwhile, has a pop-up iron sight that, when raised, is directly in front of the objective lens. The agency's night vision sights expert testified that he believed that the objective lens on the MUNS 911M sight (S/N 0060) became cracked at the notch when the lens struck the iron sight, which was folded down during firing. Tr. at I-230, I-284 to I-287. Declaration of Agency Night Vision Sights Technical Expert, Feb. 24, 2006. [2] In a January 9, 2004 memorandum to agency personnel, the subject of which was "MUNS Prototype Testing," OSTI's vice president recognized the risk posed by the front sight on the XM107, noting that it was necessary "to be careful that the units do not hit the front sight on the [XM107]. This can occur if the scope is mounted too far forward. It does not seem to be a problem when the sight is up." This memorandum lends support to the agency's expert's opinion regarding the cause of the damage to the MUNS 911M sight.

OSTI asserts that the agency's decision to test the MUNS 911M with the sight folded down was unreasonable, stating its position as follows:

> Nothing in the Solicitation mentioned the fact that the offerors should be prepared for additional accessories to be located between the rail and the proposed sight. Based on these representations, OSTI offered the MUNS 911M, which allowed enough space between the notched lens and the rail to permit limited pitching of the nightsight without striking the rail. OSTI did not expect or plan for enough space for additional equipment to be introduced between the nightsight and the rail.

OSTI Comments, Feb. 17, 2006, at 46-47. As noted by the agency, however, front and rear pop-up/fold-down iron sights are a permanent part of the XM107 rifle, as specified in the official configuration for that weapon. Further, the agency tested the sights with the iron sight folded down, since it is positioned directly in front of the night sight's objective lens, and thus would obscure part of the lens if left in the raised position, thereby reducing the amount of incoming light and the resulting image quality. Tr. at I-289 to I-290, Declaration of Agency Night Vision Sights Technical Expert, Feb. 24, 2006. We see nothing unreasonable in the agency's testing methodology with regard to the iron sight.[3]

We conclude that the agency undertook reasonable efforts to ensure that OSTI's night sights were securely mounted and properly adjusted during testing. Even if these efforts were not entirely successful (again, there is no basis in the record for reaching such a conclusion), we think the agency could reasonably conclude that the susceptibility of OSTI's sights to significant damage and degraded performance, notwithstanding reasonable efforts to mount the sights correctly, rendered the sights technically unacceptable. Certainly, we see nothing unreasonable in the agency's determining that the sights did not meet the agency's stated need for a rugged, reliable and accurate night vision sight that could be mounted on a special forces sniper's rifle at night and without detectable noise and light emissions. Performance Specification sections 3.5.3, 4.5.4, 4.5.10, 4.6.1, 4.6.2. [4]

MATERIAL MISREPRESENTATION

OSTI asserts that, during discussions, KAC made material misrepresentations in responding to the agency's expressed concerns

regarding reported past performance problems. In this regard, in a July 21, 2005 discussion letter to KAC, the agency noted that there had been performance problems under two prior (NSWC Crane) KAC contracts--N00164-02-D-8506 (8506) (night vision sights) and N00164-02-D-8512 (8512) (night vision sights plus dayscopes). Specifically, the agency noted that there had been intellectual property disputes with subcontractors under 8506 (including OSTI, its primary subcontractor for the night vision sights), delivery problems due both to these disputes and to a lack of image intensifier tubes (manufactured by another company), rejection of some units on account of quality or configuration concerns, and late delivery of logistics documentation and status reports. In KAC's proposal as revised, KAC explained the measures it had taken to ensure that there would be no problems under the contemplated contract, including ensuring a supply of image intensifier tubes and lens, reducing dependence on subcontractors, ensuring that KAC has ownership of the required intellectual property rights, negotiating agreements with proposed subcontractors to preclude the reoccurrence of the issues encountered with the subcontractors under the prior contracts, organizing a night vision division with oversight by a newly hired KAC vice president with significant experience with rifle-mounted night vision and thermal products, hiring additional personnel to manage logistics support and reporting, and obtaining a recommendation for approval for ISO 9001:2000 certification. KAC Revised Proposal, Discussions Response at 6-14, App. A, E, I, AF.

However, as noted by the protester, in addition to explaining that changed circumstances made a recurrence of the prior problems unlikely, KAC also responded in its August submission as follows:

> Most issues for nonperformance of the contract on 8512 and 8506 lie squarely at the feet of the subcontractor [OSTI]. In an attempt to sell the product direct to the government, the subcontractor initially refused to honor its verbal agreements with KAC resulting in problems on 8512. The subcontractor subsequently raised the price to KAC causing great financial loss to KAC as KAC continued to buy the product and resell it to the government at the contract price.

KAC Discussions Response, Aug. 3, 2005, at 10. OSTI asserts that this statement included several misrepresentations: OSTI could not be blamed for most of KAC's performance problems, OSTI did not act inconsistently with its oral agreement with KAC, and OSTI's price increase to KAC was not unreasonable.

An offeror's material misrepresentation in its proposal can provide a basis for disqualification of the proposal and cancellation of a contract award based upon the proposal. A misrepresentation is material where the agency relied upon it and it likely had a significant impact on the evaluation. Greenleaf Constr. Co., Inc., B-293105.18, B-293105.19, Jan. 17, 2006, 2006 CPD para. ___ at 4; Integration Techs. Group, Inc., B-291657, Feb. 13, 2003, 2003 CPD para. 55 at 2-3.

We need not consider whether the disputed statements constitute misrepresentations, since we agree with the agency that there is no basis in the record for finding that the agency relied upon the statements such that they had a significant impact on the evaluation. As noted by the agency, the record indicates that contracting officials carefully researched KAC's past performance, including conducting interviews with contracting officers, program managers and logisticians familiar with KAC's prior contracts, and reviewing the Contractor Performance Assessment Reports (CPAR) for the contracts. While the CPARs documented the

problems encountered under the contracts, they also documented KAC's correction of many of these problems. The final CPAR for 8506 indicated that the assessing official "probably would award" to KAC again. In addition, in evaluating KAC's proposal as low risk, the agency took into account the further measures, as discussed in KAC's proposal, that KAC undertook to preclude a recurrence of the problems encountered under the prior contracts. Source Selection Decision at 1; Source Selection Evaluation Final Report at 10; Tr. at I-21 to I-37, I-48, I-54, I-77 to I-80, I-83. We conclude that there is no basis for finding that the statements in question had a significant impact upon the evaluation of KAC's proposal.

OSTI asserts that KAC also misrepresented the role to be played in contract performance by a proposed subcontractor, Optics 1. In this regard, in response to the agency's notice during discussions that KAC's proposal failed to state what roles the contractor and subcontractors would serve in the production of the sights, KAC responded on March 8 that its proposed subcontractor "Optics 1 will be tasked with assembly and test of the optical subassemblies." KAC Discussions Response, Mar. 8, 2005. However, KACs vice president in charge of its weapons sight program testified during the hearing in this matter that Optics 1 "is a good optics facility that I use on various programs," but that it is one that he nevertheless "do[es] not currently intend to use" on this program. Tr. at I-356 to I-357. OSTI asserts that the testimony of KAC's vice president establishes that KAC misrepresented in its proposal Optics 1's expected role in contract performance.

OSTI's argument is without merit. KAC's vice president testified that KAC intended as early as May 2004 to develop an in-house capability for optics assembly, but that it was not able to equip the necessary space and hire and train the necessary personnel to manufacture its sight in-house until the fall of 2005. Thus, when KAC submitted its proposal in January 2005, it fully intended to use Optics 1 for optics assembly, consistent with its proposal. Tr. at II-425 to II-438. In any case, KAC's final revised proposal, submitted in August 2005, advised the agency of KAC's intentions in this regard. Specifically, the proposal stated that

it must be noted that KAC is only minimally dependent on subcontractors for successfully meeting the requirements of this solicitation. As previously stated, the mechanical design was done at KAC, the optical design was purchased, the parts are manufactured at KAC and currently assembled and tested at KAC. Tubes and lenses are currently 7 months ahead of the delivery schedule required by this solicitation if the order was placed today.

KAC Revised Proposal, Aug. 3, 2005, at 13. While it appears that the agency may not have fully understood KAC's plans with respect to Optics 1, Tr. at I-372, the testimony of the SSEB chairman indicates that the agency did generally understand that "KAC was taking on a bigger role in the manufacturing of this sight." Tr. at I-375. At any rate, given the statement in its August 2005 final proposal that "the parts are

manufactured at KAC and currently assembled and tested at KAC," there is no basis for concluding that KAC misrepresented its intention to assemble the parts in-house.[5]

The protest is denied.

Anthony H. Gamboa

General Counsel

_____

[1] MOA is a unit of angular measurement of the accuracy of a firearm, indicating that, under ideal conditions, the firearm is capable of repeatedly producing a group of shots that fit into a circle, the diameter of which can be subtended by that amount of arc. Thus, one MOA results in approximately a 1-inch circle at 100 yards.

[2] The agency's night vision sights expert indicated that the iron sight was not a problem for the OSTI MUNS 911XR sight or the KAC UNS LR-LP sight, since they have smaller diameter objective lenses that do not wrap around the mounting rail. Although the KAC sight was tested with the iron sight folded down--just as with the MUNS 911M--it did not sustain damage. Tr. at I-288 to I-289; Declaration of Agency Night Vision Sights Technical Expert, Feb. 24, 2006.

[3] We note that OSTI has made no showing that its MUNS 911M sights were mounted too far forward on the XM107's mounting rail.

[4] OSTI asserts that the agency acted unreasonably in testing only one of OSTI's two sample MUNS 911XR sights for accuracy; according to the protester, since the tested sight had an unacceptable MOA, the agency should have tested the other sight. However, the solicitation did not provide that both sample sights would be tested, and the record indicates that the agency did not intend to fully test both samples; it requested the second sample only to accommodate the testing schedule and to cover the eventuality that one of the sights might obviously fail or break. Thus, while the agency tested the second OSTI MUNS 911M sample sight for weapons shock after the first broke, it conducted a full weapons shock test on only one of KAC's sample sights (351 rounds) and one of OSTI's MUNS 911XR sights (350 rounds) (it also shot 190 rounds with the other KAC and the other MUNS 911XR sight), and it only tested one of KAC's sample sights for accuracy. VAS Source Selection Evaluation Final Report, Test Results Matrix. The fact that the agency afforded a further opportunity for OSTI's MUNS 911M sight to demonstrate compliance with the weapons shock requirements did not require it to do the same with respect to OSTI's MUNS 911XR sight for the accuracy requirements.

[5] OSTI also asserts that the low risk rating assigned KAC's proposal was unreasonable since KAC has limited experience in manufacturing night sights (since KAC had relied upon OSTI under the prior contracts for most of the components of the sight), and because there is a significant risk that KAC will be unable to perform the contract without infringing on OSTI's intellectual

U.S. GAO - B-296516.2; B-296516.3, Optical Systems Technology, Inc., March 17, 2006

property rights. In order to maintain a protest in our Office, however, a firm must be an interested party, that is, an actual or prospective bidder or offeror whose direct economic interest will be affected by the award of or failure to award a contract. 4 C.F.R. sect. 21.0(a) (2005). A protester is not an interested party where it would not be in line for award were its protest to be sustained. Yoosung T&S, Ltd., B-291407, Nov. 15, 2002, 2002 CPD para. 204 at 2 n.3. OSTI is ineligible for award here because, as discussed above, the agency reasonably found its proposal technically unacceptable. Thus, even if KAC's proposal were evaluated as having at least some risk of nonperformance or, consistent with the solicitation directions and the Federal Acquisition Regulation (FAR), were assigned a neutral rating for lack of relevant past performance, RFP at 23; FAR sect. 15.305 (a)(2)(iv), KAC, which submitted the only technically acceptable offer, would still be in line for the award. OSTI therefore is not an interested party to raise this argument.

| Home | About GAO | Contact GAO | Privacy & Other Site Policies | FOIA | Site Map | E-mail Updates | Help |

*A c c o u n t a b i l i t y     I n t e g r i t y     R e l i a b i l i t y*