# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

KNIGHTS ARMAMENT COMPANY,

     **Plaintiff,**

-vs-            **Case No.  6:07-cv-1323-Orl-22DAB**

OPTICAL SYSTEMS TECHNOLOGY,
INC.

      **Defendants.**

_____

OPTICAL SYSTEMS TECHNOLOGY,
INC.,

   **Counter-claimant/Third Party
Plaintiff,**

v.

KNIGHTS ARMAMENT COMPANY,

     **Counterclaim Defendant,**

C. REED KNIGHT, JR.,

    **Third Party Defendant.**

_____

## ORDER

## I. INTRODUCTION

This cause comes before the Court for consideration of the following motions:

•  Plaintiff Knights Armament Company's ("KAC") Dispositive Motion for Partial

  Summary Judgment (Doc. No. 88), filed on March 9, 2009.  Defendant Optical

Systems Technology, Inc. ("OSTI") filed its response in opposition (Doc. No. 109) on April 20, 2009.

- Defendant OSTI's Motion for Summary Judgment (Doc. No. 89), filed on March 9, 2009.  Plaintiff KAC filed its response in opposition (Doc. No. 108) on April 20, 2009.

- Defendant OSTI's Motion to Strike and Evidentiary Objections to [KAC's] Summary Judgment Evidence (Doc. No. 116), filed on April 28, 2009.  Plaintiff KAC filed its response in opposition and motion for attorney's fees and costs (Doc. No. 131) on May 11, 2009.  Defendant OSTI filed its response in opposition to KAC's motion for attorney's fees and costs (Doc. No. 136) on May 20, 2009.

- Plaintiff KAC's Motion to Strike [OSTI's] Reply at Doc. 136 and Request For Attorney's Fees and Costs (Doc. No. 139) on May 26, 2009.  Defendant OSTI filed its response in opposition (Doc. No. 143) on June 8, 2009.

## II. BACKGROUND

This case arises from a dispute regarding the manufacturing and marketing of night vision devices.  In the mid-1990s, Dr. Eugene Pochapsky ("Pochapsky"), who is currently a vice president at OSTI, developed a prototype clip-on in-line night vision device ("CNVD") for use with a daylight scope on military rifles.  A daylight scope is a magnifying device mounted on the top of a sniper rifle, which a sniper can peer through to acquire a target while in a shooting position.  A CNVD, in turn, is a device that attaches to the top of a sniper rifle immediately in front of the daylight scope, allowing a sniper to acquire a target in low light

conditions.  Customers for CNVDs include the military, the Department of Defense, the Department of Justice, other federal government entities, and local law enforcement agencies.

In 1996, OSTI acquired the assets of Star Tron, a manufacturer of night vision products. As part of that transaction, Pochapsky joined OSTI to further develop his prototype.  Also in 1996, OSTI communicated with C. Reed Knight, Jr. ("Knight"), KAC's owner, regarding its prototype CNVD because KAC–unlike OSTI–was an established supplier to the military.  In 1997, Knight contacted OSTI because he thought he had a potential customer for OSTI's CNVD.  Later in 1997, Paul F. Maxin ("Maxin"), OSTI's president, and Pochapsky traveled to Florida to demonstrate the prototype CNVD to Knight.  On October 21, 1997, OSTI and KAC agreed that KAC would have temporary custody of OSTI's prototype.

Sometime thereafter, OSTI and KAC demonstrated the prototype CNVD to Lucky Cook ("Cook"), a KAC customer who represented the United States Department of Defense Special Operations Command ("SOCOM").  In 1999, SOCOM issued a contract to KAC for delivery of four pre-production versions of the prototype CNVD.  OSTI manufactured the limited production units, and KAC delivered them to SOCOM under the mark KNIGHTSCOPE.[1]  After receiving and testing these units, Cook requested certain changes to the prototype CNVD.  In 2000, after the requested design changes were made,[2] SOCOM issued a request for quote (the

---

[1] OSTI and KAC agreed that KAC would sell the CNVDs to SOCOM under the KNIGHTSCOPE mark.  OSTI claims no right, title, or interest in or to the mark KNIGHTSCOPE.

[2] OSTI contends that it paid for and performed all of the work necessary to incorporate Cook's requested design changes.  KAC asserts that both OSTI and KAC paid for and participated in

"RFQ"), a purchase order (the "Purchase Order"), and a statement of work (the "SOW") for four additional CNVDs.   Later in 2000, SOCOM issued a contract for the four CNVDs described in its Purchase Order (the "SOCOM contract").   SOCOM subsequently increased its order to eight CNVDs.   OSTI again manufactured the units,[3] and KAC delivered them to SOCOM under the mark KNIGHTSCOPE.[4]

These initial contracts led to two large government contracts through the Naval Surface Warfare Command at Crane, Indiana ("Navy Crane").   Both contracts required KAC, as the principal contractor, to deliver to Navy Crane CNVDs manufactured by OSTI, which acted as the principal subcontractor.   KAC and Navy Crane executed the first contract, Contract No. N00164-02-D-8506 (the "8506 contract"), in May 2002.

KAC and Navy Crane executed the second contract, Contract No. N00164-02-D-8512 (the "8512 contract"), in September 2002.   Navy Crane awarded the 8512 contract to KAC after KAC submitted a proposal responding to the Navy's July 2002 solicitation.   KAC prepared its proposal with input from OSTI and other subcontractors.   OSTI's intellectual property rights statement appeared on the cover sheet of each section of the proposal, stating:

> The Universal Night Sight (UNS) has been developed entirely by [OSTI] funds and OSTI maintains all right, title, and interest in and to the UNS.   Nothing contained in this proposal or as a result of any contract issued as a result of this

---

executing Cook's modifications.

[3] Although KAC acknowledges that OSTI manufactured the CNVDs, it asserts that it and OSTI developed "all production processes, procedures, and tooling for the CNVD."  (Doc. No. 88 p. 3.)

[4] The parties stipulate that "KAC delivered the eight units to SOCOM's procurement agent located at Aberdeen Proving Grounds in Maryland."  (Doc. No. 144 p. 54.)

> proposal shall convey, transfer, assign any right or interest, whatsoever, in the UNS to the United States Government or any other party.

(Doc. No. 144 p. 54.)  However, an "Executive Summary" authored by Maxin also appeared in several sections of the proposal, stating:

> [KAC] is pleased to propose the Universal Night Sight™ . . . .  The Universal Night Sight™ (Knightscope Model 007) is the product of over six years of design, development, test, and modification as a result of feedback from operational use in the field . . . .  In 1998, KAC[,] having extensive experience with small arms, weapon mounts, ergonomics, and device hardening, combined resources with OSTI to further develop the Universal Night Sight . . . .  KAC and OSTI have developed all production processes, procedures and tooling as well as installed the latest environmental . . . and optical test[s] . . . in support of a current Universal Night Sight™ production contract for the Army.

(*Id.*)

KAC and OSTI enjoyed a harmonious relationship until March 2003, when the parties met to discuss the requirements of the 8512 contract.  A dispute arose regarding who owned the rights, title, and interest to the CNVD technology.  KAC asserted that it co-owned the CNVD technology because it had helped modify, test, and pay for the CNVD during its development from the prototype phase to the completed product.  OSTI maintained that KAC did not assist in any of the modifications, testing, and cost of developing the final CNVD product.  The parties' dispute was exacerbated when OSTI learned of an April 21, 2003 cure notice letter sent by Navy Crane to KAC.  The letter sought, *inter alia*, assurances that the parties' intellectual property dispute could be resolved without further disruption to the performance of the 8512 contract.  KAC responded on April 30, 2003, proposing to substitute Optics 1, Inc. ("Optics 1") in place of OSTI to manufacture CNVDs under the contract.  Navy Crane rejected KAC's

proposal to replace OSTI with Optics 1 and terminated KAC's right to proceed under the 8512 contract.

Notwithstanding their dispute over ownership of the CNVD technology, the parties agreed that, to placate Navy Crane, OSTI would continue to manufacture the devices and KAC would continue to deliver the devices. Navy Crane then allowed the parties to proceed under the 8506 and 8512 contracts. The parties delivered CNVDs to Navy Crane under the 8506 and 8512 contracts from 2003 to 2007. Pursuant to the 8506 contract, KAC delivered to Navy Crane 300 CNVDs manufactured by OSTI, along with additional accessories. Pursuant to the 8512 contract, KAC delivered over 1,000 systems to Navy Crane, which included CNVDs manufactured by OSTI, daylight scopes manufactured by a company called Leupold, and miscellaneous accessories provided by KAC. During this same period, KAC also developed its own CNVD in conjunction with Optics 1.

In May 2003, KAC filed intent to use federal trademark applications for the marks UNIVERSAL NIGHT SIGHT, UNS, KNIGHTSCOPE, and UKS.[5] On May 10, 2005, the United States Patent and Trademark Office ("USPTO") issued federal trademark registrations to KAC in International Class 9 for UNS (Number 2,949,159), KNIGHTSCOPE (Number 2,949,160), and UKS (Number 2,949,158). KAC abandoned its trademark application for UNIVERSAL NIGHT SIGHT when it did not respond to an office action from the USPTO. Also in 2005, KAC directed its outside counsel to reapply for the UNIVERSAL NIGHT SIGHT

---

[5] KAC's Chief Operations Officer, Gary Perry ("Perry"), testified that he applied for the trademarks through the United States Patent and Trademark Office website. He asserted that he made multiple errors in applying for the trademarks, which prompted KAC to retain outside counsel in 2005 to correct and complete the registration process.

mark with the USPTO and to apply for Florida trademarks for UNS and UNIVERSAL NIGHT SIGHT.  On January 10, 2006, the State of Florida issued trademark registrations to KAC in Class 0009 for UNS (Number T06000000032) and UNIVERSAL NIGHT SIGHT (Number T06000000031).[6]  OSTI subsequently filed a Notice of Cancellation with the Trademark Trial and Appeal Board ("TTAB") at the USPTO to cancel KAC's federal trademark registration for UNS.  OSTI also applied for federal trademarks for UNS, UNIVERSAL NIGHT SIGHT, UNIVERSAL NIGHT SCOPE, MUNS, MAGNUM UNIVERSAL NIGHT SIGHT, DUNS, and DUALBAND UNIVERSAL NIGHT SIGHT.  Thereafter, KAC filed oppositions with the TTAB to cancel OSTI's trademark applications for the above marks.

On August 23, 2007, KAC filed a seven-count Complaint (Doc. No. 1) against Defendants OSTI, Omnitech Partners, Inc., Keystone Applied Technologies, Inc., Maxin, and others.[7]  KAC alleges trademark infringement, false advertising, unfair competition under the Lanham Act and Florida law, and deceptive and unfair trade practices under Florida law.[8]  In its Complaint, KAC alleges that it "has been damaged as a result of [OSTI's] use of the names

---

[6] On November 14, 2006, the USPTO issued a registered trademark to KAC for Universal Knightscope (Number 3,171,096) in International class 9.

[7] On May 21, 2008, the Court granted a Motion to Dismiss all of the defendants except for OSTI.  (Doc. No. 33.)

[8] Specifically, the Complaint alleges (1) trademark infringement in violation of 15 U.S.C. § 1051, *et seq.*, 1114, and 1116-1118 ("Count I"); (2) unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a) ("Count II"), (3) false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a) ("Count III"); (4) trademark infringement in violation of Fla. Stat. § 495.151, *et seq.* ("Count IV"); (5) misleading advertising in violation of Fla. Stat. § 817.41 ("Count V"); (6) common law unfair competition ("Count VI"); and (7) deceptive and unfair trade practices in violation of Fla. Stat. § 501.201, *et seq.* ("Count VII").

or words UNS, Universal Night Sight, Knightscope, Universal Knightscope, and UKS, or confusingly similar names and derivations thereof including UNS, Universal Night Sight, MUNS, Magnum Universal Night Sight, DUNS, Dualband Universal Night Sight, and Universal Night Scope."  (Doc. No. 1 ¶ 52.)

On August 5, 2008, OSTI filed its four-count Second Amended Counterclaim (Doc. No. 35) against KAC and Knight.[9]  The Second Amended Counterclaim alleges (1) trademark infringement in violation of the Lanham Act ("Counterclaim Count I"); (2) unfair competition in violation of the Lanham Act ("Counterclaim Count II"); (3) common law unfair competition ("Counterclaim Count III"); and (4) misappropriation of trade secrets in violation of Florida's Uniform Trade Secrets Act ("Florida's UTSA") ("Counterclaim Count IV").  Regarding Counterclaim Count IV, OSTI alleges that it provided KAC with proprietary information in connection with the SOCOM, 8506, and 8512 contracts, but that it did not authorize KAC to use its proprietary information for any other purpose.  OSTI further alleges that KAC misappropriated its trade secrets by developing a competing CNVD using OSTI's technical drawings.  Specifically, OSTI alleges that KAC misappropriated its data regarding allowable manufacturing variances, measured in thousandths of an inch, from the specified dimensions of the device's main housing (the "Tolerances"), which permit OSTI to efficiently and reliably manufacture its CNVD.  On September 10, 2007, the TTAB consolidated the parties' cancellation and opposition proceedings and suspended them pending the outcome of this case.

---

[9] OSTI filed its original counterclaim on December 21, 2007, which also named Brian Steinberger as a defendant.  (Doc. No. 7.)  The Amended Counterclaim dropped any claims against Mr. Steinberger.  (Doc. No. 22.)

Both parties now move for summary judgment.  In its motion, KAC seeks partial summary judgment in its favor on Counterclaim Count IV.  In OSTI's motion, it seeks summary judgment in its favor on all seven counts of the Complaint.

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.' " *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Adm'r U. S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds,* 30 F.3d 1347 (11th Cir. 1994)).  "There is no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Id.* at 1349.  The court considers the evidence and all inferences drawn therefrom in the light most favorable to the non-moving party. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). This standard is not altered by cross motions for summary judgment, as the court treats each motion separately. *See Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co.*, 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008).

### IV. ANALYSIS

### A. Motion to Strike Summary Judgment Evidence and Related Motions

As a preliminary matter, the Court addresses OSTI's motion to strike portions of the affidavits of Knight and Kenneth Greenslade ("Greenslade"), a vice president of KAC, as well as documents attached to Greenslade's affidavit.[10]  OSTI argues that portions of the affidavits are conclusory, inconsistent with other evidence, or constitute impermissible hearsay.  OSTI also argues that the documents attached to Greenslade's affidavit are not authenticated.

Rather than responding to OSTI's substantive arguments, KAC asserts that the Court should strike OSTI's Motion to Strike because it is an improper filing under Local Rule 3.01(c) and the Case Management and Scheduling Order ("CMSO") (Doc. No. 27).  KAC's primary argument is that OSTI's motion constitutes a "reply or further memorandum" directed to KAC's motion for summary judgment under Rule 3.01(c).  Accordingly, KAC argues that the Court should strike OSTI's motion because it was not filed with leave of the Court, as required by Rule 3.01(c).  KAC also asserts that OSTI's motion is an attempt to make an end-run around the page limit for a responsive memorandum provided by Local Rule 3.01(b) and Section II(G)-(H) of the CMSO.  Finally, KAC moves this Court for sanctions against OSTI for the attorney's fees and costs in incurred responding to OSTI's motion to strike.  KAC asserts that the Court must sanction OSTI for its violation of the Local Rules and the CMSO.

KAC's arguments miss the mark.  The cases KAC cites from the Middle District of Florida are generally inapposite.  Most of the cases involve replies and further memoranda that

---

[10] OSTI also objects to KAC's inclusion of entire deposition transcripts in support of its motion, rather than merely including the portions cited in its motion.  The Court's preference is for parties to submit entire deposition transcripts.  Accordingly, OSTI's motion is denied in this respect.

were filed without leave of the court, not motions to strike.[11]  The only case cited by KAC

involving a motion to strike, *Quitto v. Bay Colony Golf Club, Inc.*, No.

2:06-cv-286-FtM-29DNF, 2007 WL 2002537 (M.D. Fla. July 5, 2007), does not support its

argument.  In *Quitto*, the defendant filed a motion to strike portions of the plaintiff's response

to the defendant's motion for summary judgment.  2007 WL 2002537, at *13.  In response, the

plaintiff argued that portions of the defendant's motion to strike constituted an unauthorized

reply under Rule 3.01(c).  *Id.*  The court agreed with the plaintiff and struck those *portions* of

the motion to strike that "constitute[d] a reply to [the plaintiff's] response to the Motion for

Summary Judgment."  *Id.*  The court then addressed the remainder of the defendant's motion

to strike, which argued that the plaintiff's affidavit was self-serving and inconsistent with his

deposition testimony.  *Id.*  Regarding those portions of the motion, the court found that the

motion was moot because the Court did not rely on the plaintiff's affidavit to resolve the

defendant's motion for summary judgment.  *Id.*  Thus, *Quitto* makes clear that a litigant may

file a true motion to strike–one that is not a disguised reply–without leave of the court under

Rule 3.01(c).

---

[11] *See United States v. Hines*, No. 6:08-mc-21-Orl-31DAB, 2008 WL 1995066, at *1 n.1 and *5 (M.D. Fla. May 7, 2008) (striking unauthorized *reply briefs* under Rule 3.01(c)); *Hawkins v. Eslinger*, No. 6:07-cv-1261-Orl-19UAM, 2008 WL 215710, at *5 (M.D. Fla. Jan. 24, 2008) (striking "renewed" and "revised" motions to dismiss under Rule 3.01(c)); *Dawley v. NF Energy Saving Corp. of Am.*, No. 6:07-cv-872-Orl-19DAB, 2008 WL 53624, at *1 n.1 (M.D. Fla. Jan. 2, 2008) (striking unauthorized *reply brief* under Rule 3.01(c)); *Morse v. United States*, No. 2:07-cv-249-FtM-34DNF, 2007 WL 4287535, at *1 n.2 (M.D. Fla. Dec. 4, 2007) (striking unauthorized *reply brief* under Rule 3.01(c)); *Dawley v. NF Energy Saving Corp. of Am.*, No. 6:07-cv-872-Orl-19DAB, 2007 WL 4116056, at *1 n.2 (M.D. Fla. Nov. 16, 2007) (striking, under Rule 3.01(c), the plaintiff's "response" to the defendant's response to the plaintiff's motion for summary judgment); *Tropic Sun Towers Condo. Assoc., Inc. v. Zurich Am. Ins. Co. of Ill.*, No. 6:05CV-1284ORL-18DAB, 2006 WL 3544854, at *2 (M.D. Fla. Dec. 8, 2006) (striking an unauthorized *reply brief* under Rule 3.01(c)).

In this case, OSTI's motion to strike attacks the admissibility of evidence submitted by KAC to support its motion for summary judgment and does not attempt to supplement improperly its response to KAC's motion for summary judgment. Thus, OSTI's motion is not a "reply or further memorandum" under Rule 3.01(c). As such, OSTI's motion may be filed without leave of the Court. Accordingly, the Court will consider OSTI's properly filed motion to strike and will deny KAC's motion for attorney's fees and costs.[12] The Court next addresses OSTI's specific objections to KAC's evidence.[13]

OSTI argues that portions of Knight's and Greenslade's affidavits are "impermissible conclusion[s] and [are] contradicted by the evidence in the record."[14] (Doc. No. 116 ¶¶ 7-11,

_____

[12] The Court will also deny several other motions KAC filed as a result of the parties' dispute regarding OSTI's motion to strike. In short, in response to KAC's request for attorney's fees, OSTI filed a response in opposition on May 20, 2009, arguing that its motion to strike summary judgment evidence was a proper filing and should not subject it to sanctions. (Doc. No. 136.) On May 26, 2009, KAC responded by filing a motion to strike OSTI's response to KAC's request for attorney's fees, restating much of its prior response and arguing–again–that OSTI's response was actually an unauthorized reply to KAC's response to OSTI's motion to strike. (Doc. No. 139.) On June 8, 2009, OSTI filed its response in opposition to KAC's motion to strike, arguing that it is entitled to respond to KAC's motion for attorney's fees and that its response was not a disguised reply. (Doc. No. 143.) Thankfully, OSTI did not argue that KAC's motion to strike, filed in response to OSTI's response to KAC's motion for attorney's fees, was actually a disguised reply filed without leave of the Court. Otherwise, this vicious cycle would have begun anew, only with the parties reversed.

[13] In addition, the Court notes that KAC's failure to respond substantively to OSTI's motion imposes a significant burden on the Court. In its response, KAC could have refined and narrowed the legal and factual questions presented to the Court. Instead, KAC chose to place all of its eggs in one basket by merely challenging the motion to strike on procedural grounds. As a result of this strategic decision, KAC has lost its opportunity to address OSTI's substantive arguments. At this stage of the litigation, the Court will not permit KAC to file a further memorandum under Rule 3.01(c) directed to the substantive aspects of OSTI's motion. The Court does not favor piecemeal responses to motions, which cause unnecessary delay and cost.

[14] OSTI urges the Court to strike the following assertions in Knight's affidavit: (1) that "KAC and OSTI combined resources to develop on in-line CNVD;" (2) that "KAC and OSTI made

13.)  The statements OSTI asserts are impermissible conclusions are merely general, factual assertions with which OSTI disagrees.  The Court declines to strike these statements.  Instead, the Court will consider these assertions in the context of all of the evidence in the record, including Knight's and Greenslade's deposition testimony and OSTI's evidence to the contrary.

OSTI also urges the Court to strike Greenslade's averments regarding KAC's activities prior to his employment, arguing that he lacks personal knowledge of such activities and that he improperly attempts to establish his knowledge by "referenc[ing] hearsay conversations" he had with Knight and  Michael Adkins ("Adkins"), a vice president at KAC, about KAC's prior activities.  OSTI's argument is wholly without merit.  Under Federal Rule of Evidence 801(c), "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Greenslade's averment that he had conversations with Knight and Adkins is not hearsay; it is a sworn statement made by the declarant, Greenslade, merely to establish that the conversations transpired.  Moreover, Greenslade's statements about what he learned during his conversations are not hearsay.  Again, those statements are made under oath by Greenslade, as the declarant, and are not hearsay.  Accordingly, the Court will not strike these statements.

---

modifications and improvements to the device;" (3) that "KAC and OSTI developed all production processes, procedures, and tooling for the CNVD;" (4) that "KAC also invested substantial financial resources in the development project;" and (5) that KAC "had co-developed, tested, paid for, and provided manufacturing expertise for the product's development."  (*Id.* at ¶¶ 7-11.)  OSTI also urges the Court to strike the assertion in Greenslade's affidavit that "[w]ithin two or three months of April/May 2004 . . . KAC disclosed, displayed, and sold CNVD products . . . which were *not* manufactured by OSTI."  (*Id.* at ¶ 13.)

Finally, OSTI argues that the Court should strike the technical drawing attached to Greenslade's affidavit and his statements regarding that drawing. OSTI argues that Greenslade cannot authenticate the drawing because he does not have personal knowledge of the drawing. Greenslade's affidavit states that "KAC was able to locate a very detailed drawing" that he asserts originated from OSTI and does not contain OSTI's proprietary rights statement. (Doc. No. 88-4 ¶ 17.) Federal Rule of Evidence 901(a) provides that "authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evidence may be authenticated by the testimony of a witness with knowledge "that a matter is what it is claimed to be." Fed. R. Evid. 901(b)(1). However, evidence may also be authenticated if its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," indicates that it is what its proponent claims. Fed. R. Evid. 901(b)(2). In this case, Greenslade does not have personal knowledge regarding the origins of the drawing, but the legend indicates that it is a drawing of the Knightscope's housing and it bears the name "Optical Systems Technology." Because the drawing's appearance and contents indicates that it is a drawing of the Knightscope housing from OSTI, the Court will not strike it for purposes of summary judgment. However, the Court notes that the drawing has little significance for purposes of summary judgment because KAC cannot verify when the drawing was prepared, when it was acquired by KAC, how KAC acquired it, or whether it was accompanied by other documents containing proprietary rights statements applicable to the drawing. Accordingly, OSTI's motion to strike is DENIED.

**B. KAC's Motion for Summary Judgment on Counterclaim Count IV**

*1. The Parties' Arguments*

In its motion, KAC seeks summary judgment on Counterclaim Count IV, which alleges that KAC misappropriated OSTI's trade secrets in violation of Florida's UTSA.  KAC asserts that the three-year statute of limitations under Florida's UTSA has run.  (Doc. No. 88 p. 5.) KAC argues that the evidence indicates that OSTI knew of or should have discovered KAC's alleged trade secret misappropriation between 2003 and mid-2004.  (*Id.* at 6-23 (citing OSTI's interrogatory responses and deposition testimony).)   Noting that OSTI did not file its counterclaim until December 21, 2007, more than three years after the middle of 2004, KAC asserts that Counterclaim Count IV is barred.  (*Id.* at 5-6.)  KAC also argues that summary judgment is appropriate because OSTI has not produced sufficient evidence that its tolerances are a trade secret under Florida's UTSA, that KAC misappropriated its trade secrets, or that OSTI suffered any damages.  (*Id.* at 24.)

In response, OSTI argues that it filed suit within three years of discovering KAC's alleged trade secret misappropriation.  (Doc. No. 109 pp. 1-2.)  OSTI argues that although it suspected misconduct by KAC, it did not have knowledge sufficient to run the statute of limitations until March 2006, when Matzko first viewed KAC's competing device at a trade show.  (*Id.* at 11-12.)  Moreover, OSTI argues that whether it knew or should have discovered that KAC misappropriated its trade secrets prior to December 2004 is a question of fact that is not susceptible to resolution on summary judgment.  (*Id.* at 2.)  Finally, OSTI asserts that it has produced sufficient evidence for a reasonable factfinder to conclude that its tolerances are trade secrets, KAC misappropriated those secrets to manufacture a competing product, and that sales of that product have damaged OSTI.  (*Id.*)

*2. Florida's UTSA*

Florida's UTSA allows a claimant to seek injunctive relief or damages to remedy another party's misappropriation of the claimant's trade secrets.  It defines a trade secret as follows:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4) (2008).  In addition, misappropriation is defined as follows:

> (a) Acquisition of a trade secret by another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> . . . .
> 2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
> . . . .
> b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

Fla. Stat. § 688.002(2).  Finally, Florida's UTSA provides that "[a]n action for misappropriation must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  Fla. Stat. § 688.007.

Courts have not addressed the circumstances under which a claimant is deemed to have knowledge of or by the exercise of reasonable diligence should have discovered a misappropriation of its trade secrets under Florida's UTSA.  However, federal district courts

-16-

construing Florida's UTSA have found that interpretations of other states' identical or similar UTSA provisions are persuasive. *See Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1292 (S.D. Fla. 2001) (finding the Eighth Circuit's interpretation of Iowa's UTSA "particularly applicable" because it was identical to Florida's UTSA); *see also* Fla. Stat. § 688.009 ("Sections 688.001-688.009 shall be applied and construed to effectuate [the UTSA's] general purpose to make uniform the law with respect to the subject of this act among states enacting it."). Courts interpreting UTSA statute of limitations provisions similar to Florida's have held that suspicion alone is not sufficient to run the statute of limitations. *See, e.g.*, *Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994) (holding that "concerns and suspicions rather than knowledge" of trade secret misappropriation "do not start the clock of the statute of limitations" under a provision of Wisconsin's UTSA nearly identical to Florida's UTSA); *Spectralytics, Inc. v. Cordis Corp.*, 576 F. Supp. 2d 1030, 1059-60 (D. Minn. 2008) (interpreting a provision in Ohio's UTSA that is nearly identical to Florida's UTSA except that it affords a four year period instead of three years); *Porex Corp. v. Haldopoulos*, 644 S.E.2d 349, 354 (Ga. Ct. App. 2007) (interpreting a Georgia UTSA statute of limitations provision that is identical to Florida's except that it affords a five-year period instead of three years). Although suspicion alone is insufficient to run the limitations period, "when there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation." *Alamar Biosciences v. Difco Laboratories*, No. Civ-S-941856, 1995 WL

912345, at *3 (E.D. Cal. Oct.13, 1995) (citing *Intermedics, Inc. v. Ventritex, Inc.*, 804 F.Supp. 35, 44 (N.D. Cal. 1992)).

### 3. *Florida's UTSA Statute of Limitations Bars Counterclaim Count IV*

KAC is entitled to summary judgment on Counterclaim Count IV because the undisputed facts indicate that Florida's UTSA statute of limitations bars OSTI's misappropriation claim. OSTI filed its original counterclaim on December 21, 2007. (Doc. No. 7.) OSTI's claims are barred by Florida's UTSA statute of limitations, therefore, if it knew of or by the exercise of reasonable diligence should have discovered KAC's alleged trade secret misappropriation prior to December 21, 2004. Based on the evidence in the record and drawing all inferences in favor of OSTI, the Court concludes as a matter of law that OSTI's trade secret misappropriation claim is barred by the statute of limitations.

In its interrogatory numbered twenty-one, KAC requested that OSTI indicate when it became aware of KAC's alleged misappropriation of its trade secrets. In its verified third supplemental response, OSTI stated:

> OSTI first became aware of [KAC's] intent to misappropriate OSTI's confidential information and trade secrets when [Knight] stated in a meeting that [KAC] and OSTI shared the UNS™ technology and [Maxin] stated that Knight was incorrect and that OSTI alone owned the technology. OSTI learned through the April 21, 2003 letter from [Navy Crane] to KAC, a copy of which . . . was emailed to OSTI on May 28, 2003[,] that [KAC] had attempted to misappropriate OSTI's UNS™ drawings. Furthermore, KAC and Knight deliberately removed OSTI's proprietary markings from OSTI's UNS™ drawing being supplied to the Government in connection with the [8512 contract] proposal . . . and attempted to substitute KAC markings. After the Government identified this malfeasance, it alerted OSTI to KAC's wrongful activities and directed KAC to secure permission to remove OSTI's markings from same. On information and belief, KAC provided OSTI's UNS™ drawings and technology to third parties, including Optics 1, for the purpose of attempting to copy OSTI's UNS™ product. OSTI strongly suspected that KAC had

-18-

> misappropriated its trade secrets pertaining to the tolerances on the main housing when OSTI learned that KAC was offering a UNS that had been manufactured by either KAC or some third party, and actually saw and handled that device in the last week of March 2006.

(Doc. No. 88 Ex. E pp. 4-5.)  According to its interrogatory response, OSTI knew as early as 2003 that KAC had attempted to misappropriate its trade secrets.  The March 21, 2003 Navy Crane letter indicated that KAC had removed OSTI's markings on a drawing supplied to the government.  (Doc. No. 109 Ex. H.)  KAC responded to the government's letter shortly thereafter, asserting that the drawing was used for internal purposes as a "Source Control Drawing . . . for purchasing and receiving inspection of systems by KAC." (*Id.*)  KAC's response, however, was not sufficient to prevent the running of the statute of limitations, given the subsequent interactions between KAC and Navy Crane.

Specifically, the Navy Crane letter also sought assurances from KAC that it could resolve its disputes with OSTI and satisfy its delivery obligations under the 8512 contract.  KAC's response addressed Navy Crane's concerns by proposing to substitute Optics 1 for OSTI as the subcontractor on the 8512 contract.  (*Id.*)  KAC's proposal stated that Optics 1 and KAC, through an accelerated program, could provide a system that "will be physically identical to the UNS proposed [under the 8512 contract]" without using "any OSTI Intellectual Properties." (*Id.* at Ex. H pp. 8-9.)  Maxin asserts, however, that KAC's proposal to use Optics 1 incorporated components of OSTI's system for manufacturing the main housing of its CNVD.  (*Id.* at Ex. C pp. 6:24-7:22.)  Moreover, Maxin asserts that the drawings for KAC's competing device incorporated some of OSTI's Tolerances and were derived from the drawings OSTI provided to KAC.  (Doc. No. 109-2 ¶ 31.)  Although the government rejected KAC's proposal

to substitute Optics 1, this evidence indicates that OSTI knew that KAC had misappropriated the Tolerances in its response to Navy Crane's 2003 letter.  (Doc. No. 109 Exs. I- J; Doc. No. 88 Ex. H p. 68:1-11.)

KAC also argues that even if OSTI did not know of KAC's alleged misappropriation before December 21, 2004, it did not take reasonable steps to discover the alleged misappropriation prior to that time.  (Doc. No. 88 p. 17.)  For example, during 2003 and 2004, Maxin testified that OSTI heard rumors and received anonymous tips that KAC was developing a competing CNVD, which further aroused OSTI's suspicions that KAC was using its trade secrets.  (*Id.* at Ex. H-1 p. 200:3-19.)  In response to these rumors, OSTI sought assurances from KAC that it was not misappropriating OSTI trade secrets and from Optics 1 that it had not received OSTI trade secrets from KAC.  (*Id.* at Ex. H-4.)

Regarding KAC, OSTI sought assurances in a February 24, 2004 letter from Maxin to Knight that "OSTI's proprietary intellectual property will not be subject to any unauthorized release or use."  (*Id.* at Ex. H-4 p. 2.)  In his March 1, 2004 letter, Adkins responded that KAC "would not allow any compromise of the discussed OSTI drawings or data" and that "all material received from OSTI and so marked were collected and have been quarantined in my office files."  (*Id.* at Ex. H-4 p. 3.)  Although OSTI was not satisfied with Adkins' response, it did nothing to further investigate its suspicions.  (*Id.* at Ex. J-1 pp. 128:5-17.)  On October 19, 2004, Lloyd Conley ("Conley"), the Chief Operating Officer of OSTI, sent a letter to Greenslade describing OSTI's belief that "KAC, through its confidential relationship with OSTI, may have obtained and misused OSTI UNS proprietary information, data and apparatus to develop a competitive product."  (*Id.* at H-5 p. 6.)  The letter also requested a meeting of the

principals of the companies to resolve OSTI's concerns.  (*Id.*)  In response, Mr. Greenslade stated that he could not comment on OSTI's allegations, but expressed a willingness to meet with OSTI regarding these issues.  (*Id.* at Ex. H-5 p. 8.)

Regarding Optics 1, OSTI sent multiple letters to its president, Dane Hileman, throughout the summer of 2004.  Its letters requested that Optics 1 disclose any information provided to it by KAC regarding design and manufacture of OSTI's CNVD and provide an explanation of how Optics 1 came into possession of each document.  (*Id.* at Ex. H-4 p. 11.) After exchanging letters and phone calls, Optics 1 stated on August 18, 2004, that it had no knowledge of any conduct by KAC "constituting unauthorized use of OSTI's confidential proprietary information."  (*Id.* at Ex. H-4 p. 22.)  Optics 1 further asserted that it had "never received any drawings or specifications for OSTI's Universal Night Sight."  (*Id.*)

The undisputed evidence supports KAC's claim that OSTI did not take reasonable steps to investigate its suspicions after receiving unsatisfactory assurances from KAC and Optics 1 in the fall of 2004.  (*Id.*)  Greenslade asserts that KAC began selling its competitive CNVD "[w]ithin two or three months of April/May 2004" and "OSTI could have, if it desired to do so, ordered a 2004 KAC CNVD from KAC for its own use or simply asked anyone who had already purchased one to inspect the product."  (Doc. No. 88-4 ¶¶ 6, 15.)  According to Maxin, OSTI never obtained KAC's product.  (Doc. No. 109 Ex. C p. 70:1-20.)  Maxin testified that OSTI made inquiries about KAC's product, but he could not provide specific details about what steps OSTI took to locate KAC's product or when OSTI made those efforts.  (*Id.*)  Maxin further testified that he became convinced that KAC had misappropriated the Tolerances when Matzko inspected KAC's competing device at a trade show in March 2006.  (Doc. No. 88 Ex.

H-1 p. 104:2-20.)  However, even Matzko's inspection of KAC's device did not occur because of an active effort by OSTI to locate the product or confirm its suspicions.  (*Id.* at Ex. K pp. 131:7-132:13.)  Instead, Matzko inspected the device because KAC's booth at the trade show happened to be across from OSTI's booth.  (*Id.*)  Matzko further testified that he had attended other trade shows where KAC had a booth, but he had not visited its booth at those shows and could not indicate whether it had displayed its competing device at those shows.  (*Id.* at Ex. K p. 133:3-22.)  The evidence indicates that even though OSTI's suspicions about KAC's alleged misappropriation would have been confirmed if OSTI had inspected KAC's competing device, it never made reasonable efforts to obtain or inspect KAC's device.

In sum, the undisputed evidence indicates that OSTI knew of or should have discovered KAC's alleged trade secret misappropriation before December 21, 2004.  The evidence indicates that in 2003, OSTI knew that KAC had  removed OSTI's markings on a drawing supplied to the government and that it had used OSTI's trade secrets in its proposal to substitute Optics 1 as the subcontractor on the 8512 contract.  OSTI also knew that, by 2004, KAC had developed a competing CNVD with Optics 1.  Moreover, the evidence indicates that although OSTI was not satisfied with the assurances it received from KAC and Optics 1 that its trade secrets had not been misappropriated, it did nothing further to investigate its suspicions until March 2006.  Thus, drawing all reasonable inferences in favor of OSTI, the Court finds as a matter of law that OSTI knew of or should have discovered KAC's alleged trade secret

misappropriation prior to December 21, 2004.[15]   Accordingly, KAC's motion for summary judgment is GRANTED.

## C. OSTI's Motion for Summary Judgment on All Counts of the Complaint

*1. The Parties' Arguments*

In its motion for summary judgment, OSTI argues that all of KAC's claims depend on whether it owned the rights to certain "key" marks. (Doc. No. 89 p. 1.) OSTI identifies the key marks as UNIVERSAL NIGHT SIGHT and UNS and asserts that all other marks in this case derive from the key marks. (*Id.*) OSTI further asserts that the undisputed evidence indicates that it first used the key marks in interstate commerce, defeating any rights asserted by KAC in the marks. (*Id.*) Specifically, OSTI argues that the evidence indicates that it "first used the key marks throughout 1999 and 2000–well before KAC even alleges its first use in 2002." (*Id.*) OSTI thus concludes that its first use establishes its rights in the marks and defeats all of KAC's claims. (*Id.*)

In response, KAC first argues that the UNIVERSAL NIGHT SIGHT and UNS marks are not "key"marks.  It argues that the other marks it alleges OSTI has infringed, such as KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE, and UKS, do not derive from the UNIVERSAL NIGHT SIGHT and UNS marks.  (Doc. No. 108 p. 3.)  Thus, it asserts that genuine issues of material fact remain regarding each claim of the Complaint to the extent they relate to marks other than UNIVERSAL NIGHT SIGHT and UNS. (*Id.*) KAC next asserts that

---

[15] Because OSTI's trade secret misappropriation claim is barred by the statute of limitations under Florida's UTSA, the Court need not reach KAC's alternative argument that OSTI's evidence is not sufficient to establish a trade secret misappropriation claim.

a genuine issue of material fact exists regarding who first adopted and used the marks UNIVERSAL NIGHT SIGHT and UNS in commerce. (*Id.*) KAC relies on the Purchase Order, the RFQ, the SOW, and other documents exchanged between KAC and SOCOM during the fall of 2000, which reference "Model 007 Universal Night Sights with mounts." (*Id.*) KAC argues that these documents indicate that customers associated the marks with KAC at least as early as that year. (*Id.* at 7.) Finally, KAC argues that OSTI has failed to address its claims that even if OSTI owns the UNIVERSAL NIGHT SIGHT mark, that mark is a confusing derivative of KAC's other marks, such as UNIVERSAL KNIGHTSCOPE. (*Id.* at 3.)

In reply, OSTI asserts that the Purchase Order, RFQ, and SOW relied upon by KAC actually prove OSTI's first use, not KAC's. (Doc. No. 127 p. 2.) Specifically, OSTI asserts that in the summer of 2000, it drafted a specification for SOCOM describing its CNVD using the UNIVERSAL NIGHT SIGHT and UNS marks. (*Id.*) It further asserts that the government adopted its specification, including its marks, to create the documents that it sent to KAC. (*Id.*) Thus, OSTI argues that SOCOM's references to the marks in the Purchase Order, RFQ, and SOW actually reinforce OSTI's first use, not KAC's. (*Id.*) As additional support for this argument, OSTI asserts that whenever the government used the UNIVERSAL NIGHT SIGHT and UNS marks, KAC responded using the KNIGHTSCOPE mark. (*Id.*)

*2. Legal Standard for Trademark Infringement*

A trademark is "any word, name, symbol, or device, or any combination thereof" used "to identify and distinguish [a person's] goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. To prevail on a claim of trademark infringement, a plaintiff must prove (1) that it has a valid trademark and (2) that the defendant

"adopted an identical or similar mark such that consumers were likely to confuse the two."
*Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1216 (11th Cir. 2000) (citing 15 U.S.C. § 1125(a)).
To establish that it has a valid trademark, the plaintiff must prove that it used the mark in
commerce prior to the defendant's use of the potentially confusing mark. *Tally-Ho, Inc. v.
Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1989) ("Under the common law,
trademark rights are appropriated only through actual prior use in commerce."); *Allard Enters.,
Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998) ("[P]rior
ownership of a mark is only established as of the first actual use of a mark in a genuine
commercial transaction.").

The Lanham Act establishes the elements a claimant must prove to establish that it used
a mark in commerce. The Lanham Act applies whether the trademark is registered or not. *Gift
of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797 (11th Cir. 2003) ("[R]egistration of
a trademark is not a prerequisite to an action under the Lanham Act.").[16] The Act defines the
term "use in commerce" as

> the bona fide use of a mark in the ordinary course of trade, and not made merely
> to reserve a right in a mark. For purposes of this chapter, a mark shall be
> deemed to be in use in commerce–
>
> (1) on goods when–

---

[16] "In the absence of registration, rights to a mark traditionally have depended on the very same elements that are now included in the statutory definition: the bona fide use of a mark in commerce that was not made merely to reserve a mark for later exploitation." *Allard Enters.*, 146 F.3d at 357.

> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B) the goods are sold or transported in commerce.

15 U.S.C. § 1127.

The Eleventh Circuit has adopted "a two part test to determine whether a party has established 'prior use' of a mark sufficient to establish ownership." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1195 (11th Cir. 2001) (citing *New England Duplicating Co. v. Mendes*, 190 F.2d 415, 417-18 (1st Cir. 1951). First, the party must produce evidence showing that it adopted the mark. *Id.* Second, the party must produce evidence showing "use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Id.* Satisfaction of this test "is competent to establish ownership, even without evidence of actual sales." *Id.*

To determine whether a marked good is associated or identified with the adopter of the mark in an appropriate segment of the public mind, courts must consider the totality of the circumstances. *Id.* "Although evidence of sales is highly persuasive" under the totality of circumstances analysis, "the question of use adequate to establish appropriation remains one to be decided on the facts of each case." *Id.* (citing *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979) (internal quotations omitted). Generally, uses that are de minimis or for internal purposes are not sufficient to establish ownership rights in the mark.

*Id.* at 1196; *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975)[17] ("Secret, undisclosed internal shipments are generally inadequate to support the denomination 'use.' "). However, use of the mark "need not have gained wide public recognition . . .[,] even a single use in trade may sustain trademark rights if followed by continuous commercial utilization." *Blue Bell*, 508 F.2d at 1265; *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 123 (5th Cir. 1973) (finding that low volumes of sales established priority in a mark). With these concepts in mind, the Court next examines the totality of the circumstances to determine whether OSTI has demonstrated sufficient prior use of the marks to establish its ownership.

### 3. OSTI Owns the UNIVERSAL NIGHT SIGHT and UNS Marks

The Court finds that OSTI owns the UNIVERSAL NIGHT SIGHT and UNS marks. KAC has not produced sufficient evidence to create a genuine issue of material fact regarding either prong of the two-part *Planetary Motion* test. First, OSTI has produced ample evidence that it adopted the "key" marks. Indeed, OSTI's adoption of the marks is central to KAC's claim that OSTI's use of the marks infringed KAC's rights in those marks. Thus, no genuine issue of material fact exists regarding the first prong.

Second, the undisputed evidence indicates that OSTI first used the marks in a sufficiently public manner to distinguish its goods in an appropriate segment of the public mind. OSTI's evidence establishes that it first used the UNIVERSAL NIGHT SIGHT and UNS marks as early as the summer of 2000. In his declaration, Pochapsky states that in April 2000, Cook,

---

[17] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit prior to October 1, 1981.

the customer contact at SOCOM, provided him with a sample military specification form and asked him to "generate a performance specification for the [night vision] device." (Doc. No. 127-2 ¶ 8.) Pochapsky states that he developed the performance specifications in June and July of 2000, referring to the device as the UNIVERSAL NIGHT SIGHT and UNS because he had used those marks to refer to the device during prior discussions with Cook. (*Id.* at ¶¶ 8-9.) Substantial portions of the specification developed by Pochapsky, which was entitled "Statement of Ob[j]ectives for Universal Night Sight (UNS)" (the "Specification"), were reproduced in the SOW that Cook sent to KAC on September 30, 2000, which was entitled "Statement of Work for the Universal Night Sight."[18] (Doc. No. 108 Ex. G; Doc. No. 127-3.) Thus, the Specification indicates that OSTI began using the UNIVERSAL NIGHT SIGHT and UNS marks in the summer of 2000 to describe its CNVD to at least one prospective customer, and the SOW indicates that its customer identified those marks with the device manufactured by OSTI.[19]

---

[18] For example, Section 1.1 of the SOW, entitled "Background," was identical to Section 1 of the Specification, entitled "Scope," except that the former substituted Universal Night Sight where the former used UNS. Similarly, Section 3.2 of the SOW, entitled "Design Reviews," was virtually identical to Section 4.1 of the Specification, which was also entitled "Design Reviews." The only difference was that the former used the word "reviews" in lieu of the phrase "design reviews." Finally, the majority of the sections listed in the "System Specification for the Universal Night Sight (UNS)," which was included in the SOW, were identical to sections of the Specification prepared by Pochapsky. For example, Sections 1.2, 3.1.1, 3.1.2, 3.1.5-9, 3.1.10, 3.1.12, 3.12.1, 3.1.14, 3.1.15, and 3.2 of the SOW's System Specification were identical or substantially identical to Sections 4.3, 4.4, 4.4.1, 4.6.1-5, 4.6.6, 4.6.8, 4.6.8.1, 4.6.10, 4.6.10, and 4.7 of the Specification, respectively.

[19] OSTI's additional evidence regarding its use of the UNIVERSAL NIGHT SIGHT and UNS marks in 1999 and 2000 is not sufficient, by itself, to establish trademark ownership. The bulk of its evidence merely indicates that OSTI used the labels Universal Night Sight and UNS internally. For example, on a September 30, 1999 engineering drawing, Pochapsky identifies the "Project" as "UNS-4001-1." (Doc. No. 89 Ex. 31.) Pochapsky also asserts that he and others at OSTI referred to OSTI's

OSTI's evidence also establishes that it used the UNIVERSAL NIGHT SIGHT and UNS marks with customers throughout 2001. On April 4, 2001, Michael Matzko ("Matzko"), OSTI's sales and marketing manager, faxed a "cut sheet" bearing the UNIVERSAL NIGHT SIGHT mark to Officer Robert Callan of the Tucson Police Department.[20] (*Id.* at Ex. 33; Ex. 27 pp. 168:11-169:12.) Later, on October 4, 2001, Officer Callan requested a demonstration unit of OSTI's CNVD for evaluation purposes. (*Id.* at Ex. 34.) Matzko sent a demonstration unit shortly after that date. (Doc. No. 89 Ex. 27 p. 177:7-20.) Matzko also testified that Charles Greer ("Greer") of Navy Crane contacted him independently of the 8506 contract because he was interested in purchasing several of OSTI's devices. (*Id.* at Ex. 27 pp. 85:3-86:23.) Matzko further testified that Greer traveled to OSTI's facility to ensure that the CNVD was compatible with a rifle and day scope that he was using. (*Id.*) On June 26, 2001, Matzko completed an

_____

CNVD as the Universal Night Sight or UNS "since at least early to mid-1999." (Doc. No. 127-2 ¶ 7.) Two internal forms indicate that customers contacted Michael Matzko ("Matzko"), OSTI's sales and marketing manager, in late 2000 regarding OSTI's device. Specifically, one form indicates that Ray Page from Sandia National Labs contacted Matzko on November 11, 2000, seeking information about the "Universal Night Sight." (Doc. No. 89 Ex. 34.) Another form indicates that Scott McLeod from Dwyer Hill Training Center contacted Matzko on December 13, 2000, because he was interested in the "Universal Night Sight concept." (*Id.*) These forms are not sufficient to establish OSTI's use of the mark for trademark ownership purposes because they are internal documents. Moreover, Matzko does not indicate in his deposition testimony whether he or the customers used the UNIVERSAL NIGHT SIGHT mark in their conversations about the device, or whether he simply used that label for internal purposes when he completed the forms.

[20] Maxin testified in his deposition that sometime in 1999 or 2000 OSTI developed the cut sheet bearing the UNIVERSAL NIGHT SIGHT mark, which detailed technical and performance data for its CNVD. (Doc. No. 89 Ex. 26.) Maxin further testified that OSTI distributed the cut sheet to the Department of Defense, the Department of Justice, the Federal Bureau of Investigation, and other law enforcement personnel. (*Id.* at Ex. 26 p. 115:20-25.) However, Maxin could not recall any details regarding when OSTI distributed the cut sheets to customers, how many it sent out, or whether its efforts resulted in any sales. (*Id.* at Ex. 26 pp. 116:5-117:14.)

internal customer contact form indicating that Greer wanted a quote on two UNS units. (*Id.* at Ex. 21.) On July 12, 2001, Navy Crane sent a purchase order to OSTI for two "Universal Night Sight" units. (*Id.* at Ex. 36.) OSTI delivered these two units to Greer in January 2002, which it marked with stickers that read: "UNS 007 mfg. by Optical Systems Technology Freeport, PA." (Doc. No. 127-4 ¶ 4.) In addition, on September 18, 2001, Maxin faxed Greer a price quote for 700 "Universal Night Sights™."[21] (Doc. No. 89 Ex. 22.) Thus, OSTI's evidence establishes that it first used the UNIVERSAL NIGHT SIGHT and UNS marks in 2000 in its interactions with Cook regarding the SOCOM contract, that it continued to use the marks in its interactions with customers throughout 2001, and that it affixed the UNS mark on two devices it delivered to Greer in January 2002.

In contrast, KAC's evidence indicates that it did not use the UNIVERSAL NIGHT SIGHT or UNS marks until 2002. In its interrogatory responses, KAC stated that "the first use of the marks 'UNS,' 'Universal Night Sight,' [']Universal Knightscope' and 'UKS' on a Night Vision Device were offered on [the 8512 contract] with Navy Crane in 2002." (Doc. No. 89 Ex. 9 p. 11.) In his deposition, Adkins testified that the first time he remembers seeing the labels Universal Night Sight and UNS was in the government's SOW. (Doc. No. 89 Ex. 23 pp. 45:17-46:20.) He also testified that nobody at KAC participated in the creation of the SOW. (*Id.* at Ex. 23 p. 46:4-15.) Similarly, Knight testified during his deposition that the first time

---

[21] One of OSTI's customer contact forms also indicates that Doug Houghton contacted Matzko on November 21, 2001, because he was interested in up to six "Universal Night Sights" for the Royal Canadian Mounted Police. (Doc. No. 89 Ex. 34.) As discussed before, however, this customer contact form was prepared internally and does not indicate whether Matzko used the UNIVERSAL NIGHT SIGHT mark in his interactions with Mr. Houghton.

he heard the CNVD referred to by the name Universal Night Sight was at the time of the 8512

contract–sometime in 2002–when "[t]he government basically [said] that they wanted to buy

a Universal Night Sight."  (*Id.* at Ex. 24 pp. 94:19-95:12.)  He later clarified that he may have

heard the term earlier than 2002 in contract discussions regarding the prototype CNVDs.  (*Id.*

at Ex. 24 p. 96:1-16.)  He added that he believed that by the time the request for proposal on the

8512 contract "hit the street" in April 2002, the CNVD "was called Universal Night Sight." (*Id.*

at Ex. 24 p. 96:17-20.)  Finally, he testified that he believed that the government customer

originated the term Universal Night Sight because Cook persisted in calling it that even though

KAC referred to it as the Knightscope.[22]  (*Id.* at Ex. 24 p. 97:2-7.).  Knight speculated that Cook

called it the Universal Night Sight because KAC was "calling it Knightscope and [SOCOM]

wanted it to be something that was generic."[23]  (*Id.*)

Although KAC acknowledges that Knight and Adkins did not recall KAC ever using

the UNIVERSAL NIGHT SIGHT mark in commerce prior to 2002, it argues that the

documentary evidence indicates that customers associated the UNIVERSAL NIGHT SIGHT

and UNS marks with KAC as early as the year 2000.  (Doc. No. 108 p. 7.)  In his affidavit,

Adkins asserts that based on documentary evidence, "it is clear that at least as early as 2000,

KAC's customers were so accustomed to KAC's use of the name 'Universal Night Sight' " that

SOCOM sent it the Purchase Order, the RFQ, and the SOW "expressly and repeatedly us[ing]

---

[22] According to Adkins, KAC and OSTI agreed to call the CNVD the KNIGHTSCOPE under the SOCOM contract.  (Doc. No. 89 Ex. 23 pp. 28:20-29:15.)

[23] Adkins also testified, "It was my opinion that Lucky Cook [came up with the terms Universal Night Sight and UNS]."  (*Id.* at Ex. 23 p. 66:7-14.)

the names 'Universal Night Sight' and 'UNS.' "[24] (Doc. No. 108-3 ¶¶ 8-10.)  Based on these documents, KAC urges the Court to infer that the government adopted these terms because KAC's use of them must have been clearly established by the fall of 2000.

That inference is not appropriate where, as here, OSTI's evidence indicates that SOCOM adopted UNIVERSAL NIGHT SIGHT and UNS not because of KAC's extensive use of those marks, but because of OSTI's extensive use of those marks.  First, KAC's evidence merely indicates that it used those terms after the government used them in correspondence with KAC.  Even then, KAC substituted the KNIGHTSCOPE mark for the government's terms to describe the product it would deliver.  For example, although Adkins' September 20, 2000 response to the RFQ stated that "Knights Armament Company can supply the (4) Universal Night Sights with the modifications described in Section C of your request," his itemized list described the devices to be delivered as "Prototype Knightscope[s] w/o Image tube[s]."  (Doc. No. 108 Ex. E.)  In addition, his December 7, 2000 letter, written in response to the SOW, similarly distinguished between the government's request for "Universal Night Sights" and his response that KAC would provide "Knightscopes."  (*Id.* at Ex. F.)  This exchange of correspondence is consistent with Adkin's and Knight's testimony that they believed the government originated the terms.[25]  Second, as discussed above, OSTI's evidence indicates that

---

[24] Adkins asserts that the Purchase Order followed correspondence he sent to Linda White of the Research, Development and Acquisition Office located at Aberdeen Proving Grounds, Maryland. (Doc. No. 108-3 ¶ 9.)  He states that he wrote to Ms. White on September 20, 2000, and December 7, 2000, referencing the RFQ and SOW that were sent to KAC earlier in the year.  (*Id.*)

[25] As previously discussed, Adkins testified that he believed the government customer came up with the terms Universal Night Sight and UNS.  (Doc. No. 89 Ex. 23 p. 66:7-14.)  Similarly, Knight testified that KAC persisted in calling the CNVD the KNIGHTSCOPE despite what he

SOCOM, through Cook, prepared the SOW after receiving the Specification from Pochapsky. The SOW adopted much of the Specification verbatim, including its pervasive use of the terms Universal Night Sight and UNS to refer to the CNVD manufactured by OSTI.  Finally, the RFQ, SOW, and Purchase Order followed extensive communication between Pochapsky and Cook, during which Pochapsky used the UNIVERSAL NIGHT SIGHT and UNS marks extensively.  Rather than establishing that KAC's customers identified the UNIVERSAL NIGHT SIGHT and UNS marks with its product, the Purchase Order, RFQ, and SOW indicate that SOCOM identified the marks with OSTI and its product.

In sum, KAC has not produced any evidence that it used the marks UNIVERSAL NIGHT SIGHT or UNS prior to SOCOM's use of those terms in its RFQ, SOW, and Purchase Order.  KAC's evidence indicates that it first used the UNIVERSAL NIGHT SIGHT and UNS marks in commerce when it affixed those marks on a CNVD in 2002.  This use post-dates OSTI's established use of the marks by two years.  OSTI's evidence indicates that it used the marks throughout the spring and summer of 2000 when it sent the Specification to SOCOM, which later used those marks to describe the CNVD to be manufactured by OSTI when it issued the RFQ, Purchase Order, and SOW.[26]  In addition, OSTI's undisputed evidence indicates that it utilized the marks commercially throughout 2001, that it affixed the UNS mark to a product

_____

believed was the government's attempt to affix the "generic" Universal Night Sight and UNS labels. (*Id.* at Ex. 24 p. 97:2-7.)

[26] OSTI's evidence also indicates that it used the marks internally in 1999 and throughout 2000.  Although OSTI's internal uses of the marks are not sufficient to establish trademark ownership, this evidence is consistent with OSTI's claims that it first used the terms for internal purposes before using the marks to identify its CNVD product to its customers.

in January 2002, and that customers associated its marks with its CNVD product.  Accordingly, no genuine issue of material fact precludes this Court from finding that OSTI has established its prior use and ownership of the UNIVERSAL NIGHT SIGHT and UNS trademarks.

The Court also finds that OSTI owns the MAGNUM UNIVERSAL NIGHT SIGHT, MUNS, DUALBAND UNIVERSAL NIGHT SIGHT, and DUNS marks.  Thus, KAC's Complaint fails to the extent it alleges that OSTI's use of those marks infringes on the UNIVERSAL NIGHT SIGHT and UNS marks because OSTI owns all of these marks.  However, a genuine issue of material fact remains on all of KAC's claims to the extent they allege that the UNIVERSAL NIGHT SIGHT, UNS, MAGNUM UNIVERSAL NIGHT SIGHT, MUNS, DUALBAND UNIVERSAL NIGHT SIGHT, DUNS, and UNIVERSAL NIGHT SCOPE marks are confusingly similar to the KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE, and UKS marks.[27]  Accordingly, OSTI's motion for summary judgment is GRANTED on Counts I, II, III, IV, V, VI, and VII to the extent those counts allege that OSTI does not own trademarks for UNIVERSAL NIGHT SIGHT, UNS, DUALBAND UNIVERSAL NIGHT SIGHT, DUNS, MAGNUM UNIVERSAL NIGHT SIGHT, and MUNS.  The Court finds that OSTI owns all of these marks.  The motion is DENIED in all other respects.

## V. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

---

[27] The parties have not proffered any arguments or evidence regarding whether OSTI's marks are confusingly similar to the remaining marks that KAC claims it owns–KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE, and UKS.  Therefore, the Court cannot reach this question because it is not properly presented.

1. Plaintiff Knights Armament Company's Motion for Partial Summary Judgment (Doc. No. 88), filed on March 9, 2009, is GRANTED.  Knights Armament Company is entitled to judgment as a matter of law on Optical Systems Technology, Inc.'s claim of trade secret misappropriation because that claim is barred by Florida's UTSA statute of limitations. Accordingly, Count IV of Optical Systems Technology, Inc.'s Second Amended Counterclaim (Doc. No. 35) is dismissed with prejudice.

2. Defendant Optical Systems Technology, Inc's Motion for Summary Judgment (Doc. No. 89), filed on March 9, 2009, is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED in that the Court finds that Optical Systems Technology, Inc. owns the UNIVERSAL NIGHT SIGHT, UNS, DUALBAND UNIVERSAL NIGHT SIGHT, DUNS, MAGNUM UNIVERSAL NIGHT SIGHT, and MUNS trademarks.  The motion is DENIED in all other respects.

3. Defendant Optical Systems Technology, Inc.'s Motion to Strike and Evidentiary Objections to Plaintiff Knights Armament Company's Summary Judgment Evidence (Doc. No. 116), filed on April 28, 2009, is DENIED.

4. Plaintiff Knights Armament Company's Motion for Award of Attorney's Fees and Costs (Doc. No. 131), filed on May 11, 2009, is DENIED.

5. Plaintiff Knights Armament Company's Motion to Strike Optical Systems Technology, Inc.'s Reply at Doc. 136 and Request For Attorney's Fees and Costs (Doc. No. 139), filed on May 26, 2009, is DENIED.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on July 7, 2009.

Copies furnished to:

Counsel of Record
Unrepresented Party

ANNE C. CONWAY
United States District Judge