# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

KNIGHTS ARMAMENT COMPANY,

        Plaintiff,

-vs-                              Case No. 6:07-cv-1323-Orl-22KRS

OPTICAL SYSTEMS TECHNOLOGY,
INC.,

        Defendants.

_____

OPTICAL SYSTEMS TECHNOLOGY,
INC.,

      Counter-claimant/Third Party
Plaintiff,

v.

KNIGHTS ARMAMENT COMPANY,

        Counterclaim Defendant,

C. REED KNIGHT, JR.,

        Third Party Defendant.

_____

## MEMORANDUM DECISION AND ORDER

Knights Armament Company ("KAC") and Optical Systems Technology, Inc. ("OSTI")

tried this case to the Court on July 13-16, 2009. After carefully considering the evidence and

the parties' arguments, the Court issues the following decision.

# I. FINDINGS OF FACT

This case arises from a dispute regarding the manufacturing and marketing of night vision devices. In the mid-1990s, Dr. Eugene Pochapsky ("Pochapsky"), who is currently a vice president at OSTI, developed a prototype clip-on in-line night vision device (a "CNVD") for use with a daylight scope on military rifles. A daylight scope is a magnifying device mounted on the top of a sniper rifle, which a sniper can peer through to acquire a target while in a shooting position. A CNVD, in turn, is a device that attaches to the top of a sniper rifle immediately in front of the daylight scope, allowing a sniper to acquire a target in low light conditions. Customers for CNVDs include the military, the Department of Defense, the Department of Justice, other federal government entities, and local law enforcement agencies.

In 1996, OSTI acquired the assets of Star Tron, a manufacturer of night vision products. As part of that transaction, Pochapsky joined OSTI to further develop his prototype. Also in 1996, OSTI communicated with C. Reed Knight, Jr. ("Knight"), KAC's owner, regarding its prototype CNVD because KAC–unlike OSTI–was an established supplier to the military. In 1997, Knight contacted OSTI because he thought he had a potential customer for OSTI's CNVD. Later in 1997, Paul F. Maxin ("Maxin"), OSTI's president, and Pochapsky traveled to Florida to demonstrate the prototype CNVD to Knight. On October 21, 1997, OSTI and KAC agreed that KAC would have temporary custody of OSTI's prototype.

Sometime thereafter, OSTI and KAC demonstrated the prototype CNVD to Lucky Cook ("Cook"), a KAC customer who represented the United States Department of Defense Special Operations Command ("SOCOM"). In 1999, SOCOM issued a contract to KAC for delivery

of four developmental units of the prototype CNVD (the "First Developmental Contract").

OSTI manufactured the developmental units, and KAC delivered them to SOCOM. Neither

Knight or Maxin could recall precisely how the companies marked the CNVDs delivered under

the First Developmental Contract, but both stated that the devices were likely marked with the

terms "Knightscope" and "UNS007."[1]

After receiving and testing the first four devices, Cook met with representatives of KAC

and OSTI and requested changes to the prototype CNVD. Specifically, Cook wanted the focus

control knob moved to the rear of the device, so it would be closer to the user, the on/off switch

moved from the top of the device to the side and integrated with the gain control, and the

battery compartment rotated 180 degrees and enlarged to accommodate two batteries that could

be replaced without detaching the device from the weapon's mounting rail. KAC and OSTI

worked together to incorporate Cook's requested changes.[2]

SOCOM then issued to KAC a request for quote, a purchase order, and a statement of

work for four developmental CNVDs incorporating Cook's design changes. Eventually, in the

fall of 2000, SOCOM issued a contract for the four CNVDs described in the purchase order (the

"Second Developmental Contract"). SOCOM and KAC subsequently executed another contract

for four additional CNVDs (the "Third Developmental Contract"). OSTI again manufactured

---

[1] OSTI and KAC agreed that KAC would sell the CNVDs to SOCOM under the KNIGHTSCOPE mark. OSTI claims no right, title, or interest in or to the mark KNIGHTSCOPE.

[2] Although Maxin asserted that OSTI paid for and performed all of the work necessary to incorporate Cook's design changes, the Court credits the testimony of Knight and Cook that KAC participated in the redesign process.

the units, KAC marked them with the terms "Knightscope" and "UNS007," and KAC then delivered them to SOCOM.

These initial contracts led to two large government contracts through the Naval Surface Warfare Command at Crane, Indiana ("Navy Crane"). Both contracts required KAC, as the principal contractor, to deliver to Navy Crane CNVDs manufactured by OSTI, which acted as the principal subcontractor. KAC and Navy Crane executed the first contract, Contract No. N00164-02-D-8506 (the "8506 contract"), in May 2002. Under the 8506 contract, KAC delivered to Navy Crane approximately 300 CNVDs manufactured by OSTI, along with additional accessories. KAC marked all of the CNVDs manufactured under the 8506 contract with the same mark it applied to the devices delivered to SOCOM under the Second and Third Developmental Contracts, except that it assigned a unique serial number to each unit. Specifically, KAC marked the devices as follows:

KnightScope™

MFG. BY
OPTICAL SYSTEMS TECHNOLOGY
FREEPORT, PA
EXCLUSIVELY FOR
KNIGHT'S ARMAMENT COMPANY

MDL: UNS007 TYPE:AJ
P/N: 98621
S/N: 0186

(Def.'s Ex. 144.)

KAC and Navy Crane executed the second contract, Contract No. N00164-02-D-8512 (the "8512 contract"), in September 2002. Navy Crane awarded the 8512 contract to KAC after

KAC submitted a proposal responding to the Navy's July 2002 solicitation. KAC prepared its proposal with input from OSTI and other subcontractors. OSTI's intellectual property rights statement appeared on the cover sheet of each section of the proposal, stating:

> The Universal Night Sight (UNS) has been developed entirely by [OSTI] funds and OSTI maintains all right, title, and interest in and to the UNS. Nothing contained in this proposal or as a result of any contract issued as a result of this proposal shall convey, transfer, assign any right or interest, whatsoever, in the UNS to the United States Government or any other party.

(Pl.'s Ex. 9(b).) However, an "Executive Summary" authored by Maxin also appeared in several sections of the proposal, stating:

> [KAC] is pleased to propose the Universal Night Sight™ . . . . The Universal Night Sight™ (Knightscope Model 007) is the product of over six years of design, development, test[ing], and modification as a result of feedback from operational use in the field . . . . In 1998, KAC[,] having extensive experience with small arms, weapon mounts, ergonomics, and device hardening, combined resources with OSTI to further develop the Universal Night Sight . . . . KAC and OSTI have developed all production processes, procedures and tooling as well as installed the latest environmental . . . and optical test[s] . . . in support of a current Universal Night Sight™ production contract for the Army.

(*Id.*)

Apart from the 8506 and 8512 contracts and outside of its relationship with KAC, OSTI also agreed to sell two of its CNVDs to Charles Greer ("Greer") of Navy Crane (the "Greer Contract"). On July 12, 2001, Greer sent a purchase order to OSTI for two "Universal Night Sight" units. (Def.'s Ex. 22.) OSTI delivered the two units specified in the Greer Contract in January 2002, which Maxin testified were marked with stickers that read: "UNS 007 mfg. by Optical Systems Technology Freeport, PA."

KAC and OSTI enjoyed a harmonious relationship until March 2003, when the parties met to discuss the requirements of the 8512 contract. A dispute arose regarding who owned the

rights, title, and interest to the CNVD technology. KAC asserted that it co-owned the CNVD technology because it had helped modify, test, and pay for the CNVD during its development from the prototype phase to the completed product. OSTI maintained that KAC did not assist in any of the modifications, testing, and cost of developing the final CNVD product. The parties' dispute was exacerbated when OSTI learned of an April 21, 2003 cure notice letter sent by Navy Crane to KAC. The letter sought, *inter alia*, assurances that the parties' intellectual property dispute could be resolved without further disruption to the performance of the 8512 contract. KAC responded on April 30, 2003, proposing to substitute Optics 1, Inc. ("Optics 1") in place of OSTI to manufacture CNVDs under the contract. Navy Crane rejected KAC's proposal to replace OSTI with Optics 1 and terminated KAC's right to proceed under the 8512 contract.

Notwithstanding their dispute over ownership of the CNVD technology, the parties agreed that, to placate Navy Crane, OSTI would continue to manufacture the devices and KAC would continue to deliver the devices. The parties agreed that the CNVDs delivered under the 8512 contract would bear the following mark:

Contract N00164-02-D-8512
Universal Night Sight™
Designed and Manufactured by:
Optical Systems Technology
110 Kountz Lane    Freeport, PA USA
Model: 911        Serial: 00000
Part: 55562 Rev 0 Type: AJ
Warranty Exp: May 2004

(Def.'s Ex. 125 (identified by counsel for OSTI as "Photo of CNVD as marked under 8512 contract").) Navy Crane then allowed the parties to proceed and, over the course of several

years, KAC delivered over 1,000 systems to Navy Crane under that contract. The systems delivered to Navy Crane included CNVDs manufactured by OSTI, daylight scopes manufactured by a company called Leupold, and miscellaneous accessories provided by KAC. Also in 2003, KAC developed its own CNVD in conjunction with Optics 1.

In May 2003, KAC filed intent to use federal trademark applications for the marks UNIVERSAL NIGHT SIGHT, UNS, KNIGHTSCOPE, and UKS. In 2005, the United States Patent and Trademark Office ("USPTO") issued federal trademark registrations to KAC in International Class 9 for UNS (Number 2,949,159), KNIGHTSCOPE (Number 2,949,160), and UKS (Number 2,949,158). KAC abandoned its trademark application for UNIVERSAL NIGHT SIGHT when it did not respond to an office action from the USPTO. Also in 2005, KAC directed its outside counsel to reapply for the UNIVERSAL NIGHT SIGHT mark with the USPTO and to apply for Florida trademarks for UNS and UNIVERSAL NIGHT SIGHT.[3] In 2006, the State of Florida issued trademark registrations to KAC in Class 0009 for UNS (Number T06000000032) and UNIVERSAL NIGHT SIGHT (Number T06000000031). OSTI subsequently filed a Notice of Cancellation with the Trademark Trial and Appeal Board ("TTAB") at the USPTO to cancel KAC's federal trademark registration for UNS. OSTI also applied for federal trademarks for UNS, UNIVERSAL NIGHT SIGHT, UNIVERSAL NIGHT SCOPE, MUNS, MAGNUM UNIVERSAL NIGHT SIGHT, DUNS, and DUALBAND UNIVERSAL NIGHT SIGHT. Thereafter, KAC filed oppositions with the TTAB to cancel

---

[3] KAC's Chief Operations Officer, Gary Perry ("Perry"), testified that he submitted the 2003 applications through the USPTO website. He asserted that he made multiple errors in applying for the trademarks, which prompted KAC to retain outside counsel in 2005 to correct and complete the registration process.

OSTI's trademark applications. The TTAB then consolidated the parties' cancellation and opposition proceedings.

Before the TTAB issued a decision on the consolidated proceedings, KAC filed a seven-count Complaint (Doc. No. 1) against Defendants OSTI, Omnitech Partners, Inc., Keystone Applied Technologies, Inc., Maxin, and others.[4] KAC alleges trademark infringement, false advertising, unfair competition under the Lanham Act and Florida law, and deceptive and unfair trade practices under Florida law.[5] In its Complaint, KAC asserts that it "has been damaged as a result of [OSTI's] use of the names or words UNS, Universal Night Sight, Knightscope, Universal Knightscope, and UKS, or confusingly similar names and derivations thereof including UNS, Universal Night Sight, MUNS, Magnum Universal Night Sight, DUNS, Dualband Universal Night Sight, and Universal Night Scope." (Doc. No. 1 ¶ 52.)

OSTI eventually filed its four-count Second Amended Counterclaim (Doc. No. 35) against KAC and Knight. The Second Amended Counterclaim alleges (1) trademark infringement in violation of the Lanham Act (Count I); (2) unfair competition in violation of the Lanham Act (Count II); (3) common law unfair competition (Count III); and (4) misappropriation of trade secrets in violation of Florida's Uniform Trade Secrets Act

---

[4] On May 21, 2008, the Court granted a Motion to Dismiss all of the defendants except for OSTI. (Doc. No. 33.)

[5] Specifically, the Complaint alleges (1) trademark infringement in violation of 15 U.S.C. § 1051, *et seq.*, 1114, and 1116-1118 (Count I); (2) unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count II), (3) false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); (4) trademark infringement in violation of Fla. Stat. § 495.151, *et seq.* (Count IV); (5) misleading advertising in violation of Fla. Stat. § 817.41 (Count V); (6) common law unfair competition (Count VI); and (7) deceptive and unfair trade practices in violation of Fla. Stat. § 501.201, *et seq.* (Count VII). (Doc. No. 1.)

("Florida's UTSA") (Count IV). After the commencement of this action, the TTAB suspended the consolidated proceeding pending the outcome of this case.

On summary judgment, the Court held that Florida's UTSA three-year statute of limitations barred OSTI's misappropriation of trade secrets claim. The Court also found that KAC could not prevail on its claims that OSTI infringed on KAC's rights in the UNIVERSAL NIGHT SIGHT and UNS marks because the undisputed evidence indicated that OSTI first used those marks in commerce. Thus, the Court held that OSTI owned the UNIVERSAL NIGHT SIGHT and UNS marks and that KAC did not have protectable rights to those marks. Finally, the Court stated that the only issues remaining for trial related to OSTI's counterclaim Counts I-III and all of KAC's claims, but only to the extent KAC alleged that OSTI's UNIVERSAL NIGHT SIGHT, UNS, MAGNUM UNIVERSAL NIGHT SIGHT, MUNS, DUALBAND UNIVERSAL NIGHT SIGHT, DUNS, and UNIVERSAL NIGHT SCOPE marks were confusingly similar to KAC's KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE, and UKS marks.

## II. ANALYSIS

### A. KAC's Claims

After summary judgment, KAC's remaining claims rely on its assertion that the marks UNIVERSAL NIGHT SIGHT and UNS are confusingly similar to KNIGHTSCOPE, UKS, and UNIVERSAL KNIGHTSCOPE.[6]  KAC did not present any evidence that UKS and UNIVERSAL KNIGHTSCOPE have ever been used in commerce.   Indeed, Knight testified

---

[6] The other marks identified in KAC's Complaint are derivative of OSTI's UNIVERSAL NIGHT SIGHT and UNS marks.

on cross examination that KAC has never sold a product marked UKS or UNIVERSAL KNIGHTSCOPE. Moreover, KAC did not present any evidence that UNIVERSAL NIGHT SIGHT or UNS are confusingly similar to KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE, or UKS. Knight testified on cross examination that he has never heard of any customer expressing confusion between the marks UNS or UNIVERSAL NIGHT SIGHT and the marks KNIGHTSCOPE, UNIVERSAL KNIGHTSCOPE, or UKS. Accordingly, the Court enters judgment in favor of OSTI on all of KAC's claims.

**B. OSTI's Counterclaims**

After summary judgment, OSTI's counterclaim consists of three counts. Count I alleges trademark infringement and trade dress infringement. Count II alleges unfair competition under the Lanham Act, and Count III alleges common law unfair competition. The Court next considers each of OSTI's remaining causes of action.

*1. Trademark Infringement*

OSTI alleges that KAC's use of the UNIVERSAL NIGHT SIGHT and UNS marks infringed on OSTI's rights in those marks. Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), KAC is liable for trademark infringement if OSTI establishes (1) that it possesses valid marks, (2) that KAC used the marks, (3) that KAC's use of the marks occurred in commerce, (4) that KAC used the marks "in connection with the sale or advertising of any goods," and (5) that KAC used the marks "in a manner likely to confuse consumers." *North Am. Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1218 (11th Cir. 2008) (internal quotation marks omitted).

On summary judgment, the Court found that KAC's could not prevail on its infringement claims against OSTI because OSTI established that it owned the UNIVERSAL NIGHT SIGHT and UNS marks by virtue of first use. However, the Court did not consider whether OSTI possessed enforceable rights in the marks because that issue was not before the Court. Thus, although the Court has found that OSTI first used the marks, it has not considered the extent of OSTI's rights in the marks. The Court must resolve this issue first because KAC cannot be liable for trademark infringement if OSTI does not possess enforceable rights in the marks. *Custom Mfg. and Engineering, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 n. 8 (11th Cir. 2007) (stating that consideration of whether a party has "a protectable interest in its trade name" is a "threshold inquiry" that may render "the likelihood-of-confusion inquiry superfluous").

Actual substantive rights to a trademark arise based on its use in commerce and its distinctiveness. *Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1522 (11th Cir. 1991). Trademark protection "is only available to distinctive marks, that is, marks that serve the purpose of identifying the source of the goods or services." *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007); *see Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008) ("A mark is entitled to trademark protection if it is capable of functioning as a source-identifier of goods."). Some marks can never become distinctive, some acquire distinctiveness by becoming associated in the minds of consumers with the products offered by the owner of the mark, and some are inherently distinctive. *Welding Servs.*, 509 F.3d at 1357 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763,

768-69 (1992)). "Distinctiveness is a question of fact, whether the question is inherent distinctiveness or acquired distinctiveness." *Id.* (citing *Investacorp*, 931 F.2d at 1523).

The degree of protection extended to a trademark depends on the classification of the mark. *Investacorp*, 931 F.2d at 1522; *Am. Historic Racing Motorcycle Assoc'n, Ltd. v. Team Obsolete Promotions*, 33 F. Supp. 2d 1000, 1004 (M.D. Fla. 1998) ("*AHRMA*"). In decreasing order of protection, trademarks are classified based on four gradations of distinctiveness: fanciful or arbitrary, suggestive, descriptive, and generic. *Custom Mfg.*, 508 F.3d at 648 n. 8 ("This categorization is . . . relevant to the first element of whether a plaintiff has enforceable rights in the mark."); *Welding Servs.*, 509 F.3d at 1357; *AHRMA*, 33 F. Supp. 2d at 1004. An arbitrary or fanciful mark bears no logical relationship to the product it represents. *Welding Servs.*, 509 F.3d at 1357; *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir. 1980) (giving example of "Kodak").[7] "A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product." *Welding Servs.*, 509 F.3d at 1357-58 (reciting example from *Soweco* of "Penguin" for refrigerators). Arbitrary, fanciful, and suggestive marks receive the strongest protection because "they have the capacity to serve a source-identifying function upon first use." *Boston Duck Tours*, 531 F.3d at 13; *Investacorp*, 931 F.2d at 1523.

A descriptive mark identifies a characteristic or quality of the product. *Welding Servs.*, 509 F.3d at 1538; *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 116 (5th Cir. 1979) (finding that

_____

[7] The Eleventh Circuit in *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981), held that all decisions of the Fifth Circuit handed down before October 1, 1981, are binding on district courts in the Eleventh Circuit.

VISION CENTER is a descriptive mark when it is used to describe a store that sells eyeglasses). A descriptive mark is not inherently distinctive and receives protection only if it acquires secondary meaning. *Investacorp*, 931 F.2d at 1522.

Finally, a generic mark describes the class to which a good belongs. *Id.* ("The term "Milk Delivery" is an example of a generic service mark for a hypothetical milk delivery service."); *AHRMA*, 33 F. Supp. 2d at 1004. Generally, a generic term is afforded no trademark protection because it is not distinctive and cannot acquire secondary meaning. *Investacorp*, 931 F. 2d at 1522; *AHRMA*, 33 F. Supp. 2d at 1004 ("Generic marks do not enjoy trademark protection because the protection of generic marks would substantially impair a competitor's ability to identify its goods or services.").

The Court next considers the distinctiveness of the UNIVERSAL NIGHT SIGHT and UNS marks to determine the degree of trademark protection each mark warrants.

i. Distinctiveness of the UNIVERSAL NIGHT SIGHT Mark

Although a court must ultimately consider the distinctiveness of a mark as a whole, this Court will first examine the component parts of the UNIVERSAL NIGHT SIGHT mark because each part is relevant to the mark's distinctiveness. *Investacorp*, 931 F.2d at 1523-24 ("Also probative of the descriptiveness of a mark is the idea that is conveyed to the observer by the plain dictionary definition of the formatives comprising the mark."). In this case, the phrase "Night Sight" is generic. "Night Sight" is a generic term used in the sniper community to refer to the genus of goods that enable a sniper to observe or acquire a target at night. *See Boston Duck Tours*, 531 F.3d at 14 ("A generic term . . . is one that either by definition or through common use has come to be understood as referring to the genus of which the particular

-13-

product is a species.").  In turn, a species of that genus is the particular night sight at issue in this case; that is, a night sight that clips onto a rail and is mounted in line with a day scope.  The generic meaning of "Night Sight" is evidenced by both OSTI's and the government's use of those words in describing the generic features of clip-on in-line night vision devices. Specifically, Maxin testified on cross-examination that prior to assigning a name to Pochapsky's prototype, OSTI referred to the device as the "Afocal Unity Magnification Night Weapon Sight," which he stated was its "functional name."  In addition, when the government solicited bids for the 8512 contract, it described the solicited product as "[a] clip-on image intensification night sight."  (Anderson Dep. 49:2-5, June 12, 2009.)

The remaining component of the mark–the word "Universal"–is descriptive.  The word universal is commonly used in business terminology as an adjective to describe a product or system that applies everywhere.[8]  Indeed, several definitions included in *Webster's Ninth New Collegiate Dictionary* 1291 (1991) encompass such a meaning.  For example, the second definition indicates that universal may describe something that is "present or occurring everywhere . . . [or] existent or operative everywhere or under all conditions."  *Webster's Ninth New Collegiate Dictionary* at 1291.  Moreover, the fifth definition indicates that universal may describe something that is "adapted or adjustable to meet varied requirements (as of use, shape, or size)" and offers the example of a "[universal] gear cutter."  *Id.*

_____

[8] For example, the Universal Product Code (commonly known as the "U.P.C.") is a widely-adopted uniform system of fifty-nine black and white bars and twelve digits that identify specific goods and their manufacturers.  *See* Reuters, *Happy Birthday, U.P.C.: Thirty-Fifth Anniversary of the Bar Code*, http://www.reuters.com/article/pressRelease/idUS119612+01-Jun-2009+BW20090601 (last visited Aug. 17, 2009).

Considering the mark as a whole, UNIVERSAL NIGHT SIGHT literally conveys to consumers that OSTI's product is a night sight that is operative under all conditions or adapted or adjustable to meet varied requirements. Because a customer in the relevant community can readily perceive the nature of OSTI's UNIVERSAL NIGHT SIGHT, without having to use her imagination, the mark is not suggestive. Accordingly, the mark UNIVERSAL NIGHT SIGHT is descriptive.

Before considering whether the UNIVERSAL NIGHT SIGHT mark has acquired secondary meaning, the Court must first consider whether UNS is an independent mark or merely an abbreviation of UNIVERSAL NIGHT SIGHT. If UNS is an independent mark, then its level of distinctiveness is considered separately from UNIVERSAL NIGHT SIGHT. However, if UNS is merely an abbreviation of UNIVERSAL NIGHT SIGHT, then UNS is accorded the same distinctiveness as UNIVERSAL NIGHT SIGHT.

ii. Whether UNS is an Abbreviation of UNIVERSAL NIGHT SIGHT

When analyzing the distinctiveness of an abbreviation, a court must consider whether the abbreviation imparts the same connotation as the phrase it abbreviates. *AHRMA*, 33 F. Supp. 2d at 1004 ("An abbreviation is treated similarly to its underlying phrase where the abbreviation imparts the original generic or descriptive connotation."). An abbreviation of a generic or descriptive phrase is protectable "if the party claiming protection for the abbreviation shows that the abbreviation has a meaning distinct from the underlying words in the mind of the public." *Welding Servs.*, 509 F.3d at 1359; *AHRMA*, 33 F. Supp. 2d at 1004 ("[A]n abbreviation is treated similarly where the average prospective customer recognizes the abbreviation as equivalent to the underlying phrase."). The party claiming protection has a

"heavy burden" to show an independent meaning for an abbreviation of a descriptive phrase. *See Welding Servs.*, 509 F.3d at 1359 (citing *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 993-94 (7th Cir. 1989)).

OSTI has not demonstrated that the abbreviation UNS has a distinct meaning from the descriptive phrase "Universal Night Sight." Instead, OSTI's evidence indicates that it consistently uses UNS in conjunction with and as an abbreviation of "Universal Night Sight." For example, Maxin's testimony regarding OSTI's participation in a program sponsored by the Office of Naval Research (the "ONR") to reduce the manufacturing cost of the CNVD indicated that OSTI regularly used UNS as an abbreviation of "Universal Night Sight." Maxin testified that the program originated during the fourth quarter of 2001 and was administered by the Applied Research Lab at Pennsylvania State University ("ARL PSU"). Maxin then stated that in the course of his interactions with the ONR and ARL PSU, he referred to the CNVD as the "Universal Night Sight, UNS." He also testified that the ONR and ARL PSU referred to the device as the "Universal Night Sight, UNS." Maxin's testimony is confirmed by the report issued by the ONR on the project, which refers to the CNVD as the "Universal Night Sight (UNS)." (Def.'s Ex. 148.)

In addition, although OSTI labeled the two CNVDs sent under the Greer Contract with the UNS 007 mark–without the accompanying phrase "Universal Night Sight"–all of the documents associated with the sale and supplied with the CNVDs indicated that UNS is an abbreviation of that phrase. The schedule of supplies on the invoice associated with the sale describes the CNVDs as "Universal Night Sights," Maxin testified that both he and Greer consistently referred to the CNVD as a "Universal Night Sight," the September 18, 2001 fax

sent by Maxin to Greer describing OSTI's production capacity refers to the CNVDs as "Universal Night Sights," and the packing slip OSTI provided with the CNVDs shipped to Greer refers to the devices as "Universal Night Sights." (*See* Def.'s Exs. 22-23, 27.) Thus, when Greer received two CNVDs marked UNS, he would have recognized that UNS was an abbreviation for the phrase "Universal Night Sight."

The trade journals and magazines submitted by OSTI also indicate that the average prospective customer is likely to associate UNS with the phrase "Universal Night Sight." For example, the January 2006 issue of *Law and Order* refers to the "AN/PVS-22 Universal Night Sight™ (UNS)." (Def.'s Ex. 147.) The April 2006 issue of *Guns & Weapons for Law Enforcement* states, "For night operations, we added an Optical Systems Technology AN/PVS-22 Universal Night Sight optic. . . . The day optic does not require an illuminated reticle when used with a UNS." (*Id.*) The May 2006 issue of *Guns & Weapons for Law Enforcement* similarly refers to the "AN/PVS-22 Universal Night Sight (UNS)." (*Id.*) The October 2006 issue of the same publication states, "One of the most significant developments in night vision technology is Optical Systems Technology's Gen III+ AN/PVS-22 Universal Night Sight (UNS)." (*Id.*) None of the trade journals or magazines submitted by OSTI use the term "UNS" without first introducing the underlying phrase "Universal Night Sight." (*Id.*)

Moreover, Maxin testified that every CNVD shipped by OSTI is accompanied with an operator's manual. Excerpts of the operator's manual were affixed by OSTI to its trademark application for the UNS mark. (Def.'s Ex. 107.) One excerpt states:

<u>Universal Night Sight</u>: Specifications and Operation

Part No. 55883

Model: 911

System Description: The UNS is designed to add night-time capability to the
Day Scope already on the weapon. The unique in line 1X night scope can be
mounted directly in front of the Day Scope and has no effect on the weapon's
point of impact.

(*Id.*) This excerpt is illustrative of OSTI's seamless alteration between "Universal Night Sight"

and its abbreviation UNS. Indeed, Maxin testified that this product literature is supplied to

every purchaser of OSTI's CNVD, thus indicating that customers were invited to associate UNS

with its underlying phrase.[9] Accordingly, the Court finds that UNS is an abbreviation of the

descriptive mark UNIVERSAL NIGHT SIGHT.

### iii. Secondary Meaning of UNIVERSAL NIGHT SIGHT and UNS

Because UNIVERSAL NIGHT SIGHT and its abbreviation UNS are descriptive marks

and are not inherently distinctive, those marks must have attained secondary meaning for OSTI

to have a protectable interest in them. *Vision Center*, 596 F.2d at 117-18 ("The case law

uniformly requires that we refuse trade name protection to a descriptive term unless it has

acquired a secondary meaning."). A descriptive term acquires secondary meaning when "the

primary significance of the term in the minds of the consuming public is not the product but the

producer." *Id.* at 118 (quoting *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118 (1938));

*see also John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 n. 12 (11th Cir. 1983).

Courts in the Eleventh Circuit consider four factors to determine whether a descriptive mark

---

[9] In addition, the proprietary rights statement that OSTI attached to the cover page of each
section of the proposal for the 8512 contract communicated to Navy Crane that UNS is an
abbreviation of "Universal Night Sight." (*See* Pl.'s Ex. 9(b) (stating, "The Universal Night Sight
(UNS) has been developed . . . .").)

has acquired secondary meaning: "(1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the user of the mark to promote a conscious connection in the public's mind between the name and the user's product or business; and (4) the extent to which the public actually identifies the name with the user's product or venture." *Custom Mfg.*, 508 F.3d at 648 n. 8; *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 800 (11th Cir. 2003). The party seeking trademark protection carries the burden of proof and must produce a "high degree of proof . . . to establish secondary meaning for a descriptive term." *Id.* Finally, the party seeking trademark protection must demonstrate that its mark acquired secondary meaning before the alleged infringer first began using the mark. *Gift of Learning*, 329 F.3d at 800) (citing J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:34 (4th ed. 1997) ("[T]he senior user must prove the existence of secondary meaning in its mark at the time and place the junior user first began use of that mark.")).

OSTI first used the marks in 1999 and 2000, when it distributed to potential customers a cut sheet describing its CNVD, which bore the UNIVERSAL NIGHT SIGHT mark. According to Pochapsky and Maxin's testimony, OSTI also used the terms Universal Night Sight and UNS with Cook during the summer of 2000 while preparing the documents related to the Second Developmental Contract with SOCOM. The record indicates that OSTI continued to use the terms Universal Night Sight and UNS with other customers in 2001. For example, Michael Matzko, OSTI's sales and marketing manager, testified that he used the terms with customers such as Officer Robert Callan of the Tucson Police Department and Greer at Navy Crane. (*See* Def.'s Exs. 20-21.) Maxin testified that OSTI also affixed the UNS mark on the two devices shipped to Navy Crane in January 2002 under the Greer Contract. Finally,

the record indicates that OSTI used the UNIVERSAL NIGHT SIGHT mark on the CNVDs it manufactured for KAC to distribute under the 8512 contract. (*See* Def.'s Ex. 125.)

However, OSTI did not establish that its marks had acquired secondary meaning prior to KAC's first use of the marks. KAC's sales records indicate that it first used the mark UNS on its own CNVD–i.e., one not manufactured by OSTI–in April 2003. (Def.'s Ex. 134.)[10] Thus, OSTI had to prove that consumers associated the marks UNIVERSAL NIGHT SIGHT and UNS with OSTI prior to April 2003. OSTI failed to meet its burden of proof.

Regarding OSTI's marketing efforts, neither Maxin or Matzko were able to identify how many cut sheets OSTI distributed in 1999 and 2000 or whether the marketing effort was successful. Moreover, although Maxin testified that OSTI also marketed its device over the internet, he could not specify a date when those efforts started. He merely suggested that OSTI began its internet marketing sometime between 2002 and 2004. In sum, OSTI did not produce any evidence that its marketing efforts succeeded in promoting a conscious connection in the relevant customer's mind between the UNIVERSAL NIGHT SIGHT and UNS marks and OSTI's CNVD prior to April 2003.

To the contrary, the record indicates that OSTI's conduct prior to 2003 actually clouded any connection a consumer might otherwise have drawn between the UNIVERSAL NIGHT SIGHT and UNS marks and OSTI's CNVD. For example, during the parties' interactions with

---

[10] Knight testified on cross-examination that as soon as KAC started manufacturing its own CNVD, it marked all of its devices with the UNS mark. Defendant's Exhibit 134 details KAC's sales of night vision equipment from 1998 through 2008. Regarding sales of KAC's own CNVD, outside of its relationship with OSTI, the exhibit describes a sale of seven "Universal Night Sights" in April 2003, one "Universal Night Sight" in August 2003, three "UNS" in July 2004, and twelve "UNS" devices in August 2004. (*See* Def.'s Ex. 134.)

SOCOM prior to 2003, both OSTI and KAC commingled their marks and never distinguished UNS as a mark belonging exclusively to OSTI. The record indicates that KAC marked all of the devices manufactured by OSTI and delivered to SOCOM under the developmental contracts with some combination of the term "Knightscope" and the phrase "MDL: UNS007," without objection from OSTI. KAC also marked all of the devices delivered under the 8506 contract with the term "Knightscope" and the phrase "MDL: UNS007," without objection by OSTI. (*See* Def.'s Ex. 144.) These markings did not associate "UNS007" exclusively with OSTI.[11] Indeed, Cook testified that he did not identify UNS or UNIVERSAL NIGHT SIGHT with either OSTI or KAC, but he instead associated those terms with the device that the parties were jointly developing. The record indicates that other customers also associated the UNS mark with the device jointly offered by OSTI and KAC. For example, Navy Crane's solicitation for the 8506 contract referred to the "Knightscope Model UNS 007," and its statement of work was entitled: "Statement of Work for the Knight's Armament Knightscope System Model UNS 007-BI." (*See* Def.'s Ex. 33.) Neither document indicates that Navy Crane associated the UNS mark exclusively with OSTI.

---

[11] Maxin testified that the "UNS007" model number was a convention adopted by OSTI to distinguish between those devices it sold through a distributor, where OSTI acted as the original equipment manufacturer ("OEM"), from those devices it sold directly to customers. Specifically, Maxin stated that OSTI used the model number "UNS911" on devices it sold directly to customers and the model number "UNS007" on devices it sold as an OEM. However, OSTI marked the devices sold under the Greer Contract with "UNS007," even though those sales were made directly to Navy Crane. This inconsistency suggests that OSTI had not implemented the convention described by Maxin prior to 2002. Moreover, Maxin acknowledged that OSTI adopted this convention for internal purposes and customers would be unable to recognize the significance of the different markings.

OSTI did not make a concerted effort to clearly associate the UNIVERSAL NIGHT SIGHT or UNS marks with the CNVDs it sold until early to mid-2003, when the parties began disputing intellectual rights issues. To placate Navy Crane and resume their performance of the 8512 contract, KAC and OSTI agreed that all CNVDs delivered under that contract would be marked with the UNIVERSAL NIGHT SIGHT mark and OSTI's name and address.[12] (See Def.'s Ex. 125.) However, as KAC's sales report indicates, KAC began selling its own CNVD with the UNS mark around the same period of time. (*See* Def.'s Ex. 134.)

Finally, although both Maxin and Matzko testified that consumers routinely express confusion regarding whether OSTI or KAC markets the UNS, the confusion that OSTI describes is not the product of infringing conduct by KAC. Instead, the confusion is attributable to OSTI's and KAC's failure to identify clearly their respective marks from 1997 to 2003, during which time they worked together to develop, market, and distribute the CNVD manufactured by OSTI. Because the parties delivered hundreds of CNVDs to customers bearing the marks KNIGHTSCOPE and UNS, without any clear indication that UNS was a

---

[12] The only evidence OSTI presented that a customer associated UNIVERSAL NIGHT SIGHT with OSTI and not KAC prior to 2003 was the deposition testimony of Kelly Anderson ("Anderson"), who was the contracting officer for Navy Crane under the 8512 contract. The Court does not find OSTI's evidence regarding Anderson's perception sufficient to carry its burden. Anderson testified that her association between UNIVERSAL NIGHT SIGHT and OSTI arose because of the proprietary rights statement included by OSTI in the 8512 proposal. (*See* Anderson Dep. 37:1-9, 39:1-41:21, Feb. 5, 2009.) However, OSTI did not include a proprietary rights statement or any other language in any of the prior contracts with SOCOM and Navy Crane that would identify OSTI as the owner of those marks. Thus, most customers who received a CNVD from OSTI through KAC had no basis for associating UNIVERSAL NIGHT SIGHT exclusively with OSTI. For instance, another government customer–Cook–testified that he associated the mark with both OSTI and KAC. Accordingly, Anderson's testimony is not sufficient to establish that the UNIVERSAL NIGHT SIGHT mark had acquired secondary meaning prior to April 2003.

mark belonging to OSTI and not KAC, customers had no reason to associate OSTI's mark with its product and not KAC's. Based on OSTI's use of its marks, its marketing efforts, and the paucity of evidence that the public actually identified OSTI's marks with its product, the Court finds that OSTI's UNIVERSAL NIGHT SIGHT and UNS marks did not acquire secondary meaning prior to KAC's first use of those marks in 2003. Accordingly, KAC cannot be held liable for trademark infringement.

*2. Trade Dress Infringement*

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, creates a federal cause of action for trade dress infringement. *John H. Harland*, 711 F.2d at 980. "Trade dress involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.* Although "[m]ost trade dress infringement actions involve the packaging or labeling of goods . . . [,] courts have recognized that the design of a product itself may constitute protectable trade dress under § 43(a) of the Lanham Act." *Id.* To prevail on a trade dress infringement claim, the plaintiff must establish three elements: (1) that "the trade dress of the two products is confusingly similar," (2) "that the features of the trade dress are primarily non-functional," and (3) "that the trade dress has acquired secondary meaning." *Id.*

OSTI cannot prevail on its trade dress infringement claim because the Court finds that both OSTI and KAC developed the trade dress of the CNVD at issue in this case. As discussed in the Court's findings of fact, KAC was involved in all phases of the CNVD's development from its prototype version to the version sold to Navy Crane under the 8506 and 8512 contracts. Representatives of SOCOM, OSTI, and KAC met repeatedly to discuss the design and function

of the CNVD. All of the parties were involved in discussions regarding many of the trade dress features at the heart of OSTI's claims: the location and orientation of the battery pack, the placement of the focus control knob, the incorporation of the gain control with the on/off switch, and even the color of the device. Indeed, SOCOM specifically required each of these design elements in the documents soliciting the Second Developmental Contract. (*See* Def.'s Ex. 9, Section C.) For example, the request for quote stated: "The following modifications to the original prototype design shall be incorporated in the proposed order based on discussions with the Government and the Contractor [KAC] at Optical Systems Technology (OST), Freeport, Pennsylvania on 13 September 2000." *Id.* The request then detailed each of the design elements that OSTI now alleges it owns. *Id.* OSTI cannot claim exclusive ownership of the trade dress of the CNVD when KAC participated in all phases of the device's development and the final design reflected the specific requirements of SOCOM, not the whimsical design choices of OSTI's engineers. Accordingly, KAC cannot be held liable for trade dress infringement.

### 3. Unfair Competition Claims

"[A]n unfair competition claim based only upon alleged trademark infringement is practically identical to an infringement claim." *Tally-Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1025-26 n. 14 (11th Cir. 1990). In this case, OSTI's federal and state unfair competition claims are based on KAC's alleged trademark infringement. Because the Court concludes that OSTI did not have enforceable rights in the UNIVERSAL NIGHT SIGHT and UNS marks prior to KAC's first use of those marks, OSTI cannot prevail on its unfair competition claims.

### III. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. The clerk is directed to enter final judgment providing that Plaintiff Knights Armament Company shall take nothing from Defendant Optical Systems Technology, Inc. on its claims and that Counter-claimant Optical Systems Technology, Inc. shall take nothing from Counterclaim Defendant Knights Armament Company or Third-Party Defendant C. Reed Knight, Jr. on its claims.

2. All pending motions are MOOT.

3. The clerk shall close this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on August 19, 2009.

Copies furnished to:

Counsel of Record
Unrepresented Party

ANNE C. CONWAY
United States District Judge